[No. S050179. June 30, 1997.]

COUNTY OF SAN BERNARDINO et al., Plaintiffs and Appellants, v.
CITY OF SAN BERNARDINO, Defendant and Appellant;
COURTESY SERVICES OF SAN BERNARDINO, INC., et al.,
Interveners and Appellants;
APPLE VALLEY FIRE PROTECTION DISTRICT et al., Interveners and
Respondents.

910

## Counsel

Alan K. Marks, County Counsel, and Alan L. Green, Deputy County Counsel, for Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, Charlton G. Holland III, Assistant Attorney General, Dennis Eckhart and Michael V. Hammang, Deputy Attorneys General, Richards, Watson & Gershon, Harry L. Gershon and Steven H. Kaufmann for Interveners and Appellants.

De Witt W. Clinton, County Counsel (Los Angeles), Roberta M. Fesler, Assistant County Counsel, Daniel D. Mikesell, Jr., Deputy County Counsel, Lyle Rose, County Counsel (Placer), Jo McCormack, Deputy County Counsel, Thomas F. Casey III, County Counsel (San Mateo), Brenda Carlson, Deputy County Counsel, David C. Holland, County Counsel (Monterey), William K. Rentz, Deputy County Counsel, Hanson, Bridgett, Marcus, Vlahos & Rudy, Craig J. Cannizzo, Robert L. Rusky, Foley, Lardner, Weissburg & Aronson, Mark S. Windisch and R. Michael Scarano, Jr., as Amici Curiae on behalf of Plaintiffs and Appellants and Interveners and Appellants.

James F. Penman, City Attorney, Robert L. Simmons, Deputy City Attorney, Nielsen, Merksamer, Parrinello, Mueller & Naylor and John E. Mueller for Defendant and Appellant.

Eugene Dong, William D. Ross, Carol B. Sherman, Mulholland & Hickey, Thomas A. Woodley, Wylie, McBride, Jesinger, Sure & Platten, Christopher E. Platten, Christopher A. Kee, Pinnell & Kingsley, Paul Nicholas Boylan, Burke, Williams & Sorensen, Leland C. Doley, Deanna L. Ballesteros and Joseph M. Montes as Amici Curiae on behalf of Defendant and Appellant.

Stream & Stream, Kenneth B. Stream, Theodore K. Stream, Theresa Han Savage, Fred C. Hernandez, David D. Werner, Rutan & Tucker, Elizabeth Hanna Dixon, Matthew K. Ross and Scott R. Santagata for Interveners and Respondents.

Kronick, Moskovitz, Tiedemann & Girard and Ruthann C. Ziegler as Amici Curiae on behalf of Interveners and Respondents.

## OPINION

**MOSK, J.**—In this case, we address the respective roles of counties, their local emergency medical services (hereafter sometimes EMS) agencies, cities, and fire districts under the Emergency Medical Services System and the Prehospital Emergency Medical Care Personnel Act (the EMS Act). (Health & Saf. Code, § 1797 et seq.; all further statutory references are to this code unless otherwise indicated.) The Court of Appeal concluded: (1) that cities and fire districts that contracted for or provided prehospital emergency medical services as of June 1, 1980, can retain administration of such services indefinitely and need not fully integrate their operations into the systems of their county-designated local EMS agencies; (2) that the local EMS agency in this case had exceeded its authority by subjecting the City of

San Bernardino (City) to certain protocols governing the dispatch of EMS providers and their coordination at the emergency scene; and (3) that the City had the prerogative of expanding into types of emergency medical services that it did not provide as of June 1, 1980, such as ambulance services, and of excluding from its borders the ambulance company that previously had provided such services under the auspices of the County of San Bernardino (County).

We conclude that the Court of Appeal was essentially correct as to the first issue—that eligible cities and fire districts may retain administrative control of their emergency medical services until they agree otherwise with the counties in which they are located. But we conclude the Court of Appeal erred as to the other issues. Specifically, we hold that the local EMS agency acted within its authority in subjecting the City to the medical protocols at issue in this case, that the City may not expand beyond the types of emergency medical services it provided as of June 1, 1980, and that the City may not exclude the County provider from furnishing such services. We therefore affirm in part and reverse in part the judgment of the Court of Appeal.

## I.   OVERVIEW OF THE EMS ACT

The issues presented in this case are ones of first impression. In order to resolve these questions, we must discuss the historical background and general features of the EMS Act. Prior to the enactment of the EMS Act, the law governing the delivery of prehospital emergency medical services was haphazard. For example, the Government Code identified ambulance services as among the permissible " '[m]unicipal services or functions' " of counties, cities, and public districts. (Gov. Code, § 54980, subds. (b), (c).) Although these entities were permitted to contract with one another for the performance of ambulance services (id., § 54981), nothing required them to coordinate or integrate their operations in any fashion.

Beginning in late 1978, the Legislature began to explore mechanisms for imposing some structure on the delivery of prehospital emergency medical services. Senator John Garamendi introduced Senate Bill No. 125, 1979-1980 Regular Session, the measure that ultimately became the EMS Act. As originally introduced, the bill was quite limited in scope, both substantively and temporally. It was entitled the "Pre-hospital Emergency Medical Care Personnel Act," and, as the name suggests, addressed primarily the training and certification of personnel. (Sen. Bill. No. 125 (1979-1980 Reg. Sess.) as introduced Dec. 22, 1978.) Under an article entitled "State Administration," the Department of Health Services was to establish training and certification

standards, and under an article entitled "Local Administration," the "local authority," defined as a county health officer or a designated physician in a county or region, was to monitor training programs and issue certificates in compliance with the state standards. (*Ibid.*) The measure was set to expire, by its own terms, on January 1, 1984. (*Ibid.*)

During the course of its nearly two-year odyssey through the Legislature, however, Senate Bill No. 125 was amended extensively and its scope considerably broadened. The measure was renamed "the *Emergency Medical Services System and the* Pre-hospital Emergency Medical Care Personnel Act" (Assem. Amend. to Sen. Bill No. 125 (1979-1980 Reg. Sess.) Mar. 11, 1980), the name that the EMS Act now bears (see § 1797), and the scope of the bill was expanded from training and certification of personnel to prehospital emergency medical services generally. (See, e.g., Assem. Amend. to Sen. Bill No. 125 (1979-1980 Reg. Sess.) Mar. 11, 1980; Assem. Amend. to Sen. Bill No. 125 (1979-1980 Reg. Sess.) May 21, 1980.) The measure's sunset provision was deleted. (*Ibid.*)

As finally enacted in late 1980, the EMS Act contained 100 different provisions in 9 separate chapters and created a comprehensive system governing virtually every aspect of prehospital emergency medical services. The Legislature's desire to achieve coordination and integration is evident throughout. The EMS Act accomplishes this integration through what is essentially a two-tiered system of regulation. At the state level, the Emergency Medical Services Authority (Authority) performs a number of different functions relating to the coordination of EMS throughout the state, including the following: (1) assessing each emergency medical services area "utilizing regional and local information . . . for the purpose of determining the need for additional emergency medical services, coordination of emergency medical services, and the effectiveness of emergency medical services" (§ 1797.102); (2) developing "planning and implementation guidelines for emergency medical services systems," addressing personnel and training, communications, transportation, assessment of hospitals and critical care centers, system organization and management, data collection and evaluation, public information and education, and disaster response (§ 1797.103); (3) providing "technical assistance to existing agencies, counties, and cities for the purpose of developing the components of emergency medical services systems" (§ 1797.104); (4) reviewing emergency medical services plans submitted by local EMS agencies to determine whether the plans "effectively meet the needs of the persons served," are "consistent with coordinating activities in the geographical area served," and are "consistent with . . . both the guidelines and regulations, established by the [A]uthority" (§ 1797.105, subds. (a), (b)).

The second tier of governance under the EMS Act is occupied by the local EMS agency. Its duties are enumerated in chapter 4 of the act, entitled "Local Administration." (§§ 1797.200-1797.276.) Section 1797.200 provides that "[e]ach county may develop an emergency medical services program. Each county developing such a program shall designate a local EMS agency which shall be the county health department, an agency established and operated by the county, an entity with which the county contracts for the purposes of local emergency medical services administration, or a joint powers agency created for the administration of emergency medical services by agreement between counties or cities and counties pursuant to the provisions of Chapter 5 (commencing with Section 6500) of Division 7 of Title 1 of the Government Code."

If a county elects to establish an emergency medical services program, the duties of its designated local EMS agency include the following: (1) planning, implementing, and evaluating an emergency medical services system "consisting of an organized pattern of readiness and response services based on public and private agreements and operational procedures" (§ 1797.204); (2) developing a formal plan for the system in accordance with the Authority's guidelines and submitting the plan to the Authority on an annual basis (§§ 1797.250, 1797.254); (3) "consistent with such plan, coordinat[ing] and otherwise facilitat[ing] arrangements necessary to develop the emergency medical services system" (§ 1797.252). Once a local EMS agency implements its system, all providers of prehospital emergency medical services within its jurisdiction must operate within that system. (See § 1797.178 ["No person or organization shall provide advanced life support or limited advanced life support unless that person or organization is an authorized part of the emergency medical services system of the local EMS agency . . . ."].)

The authority of the local EMS agency is further elaborated in chapter 5, entitled "Medical Control" (see §§ 1798-1798.6). It provides that "[t]he medical direction and management of an emergency medical services system shall be under the medical control of the medical director of the local EMS agency. This medical control shall be maintained in accordance with standards for medical control established by the [A]uthority." (§ 1798, subd. (a).) Chapter 5 also requires that "[m]edical control shall be within an EMS system which complies with the minimum standards adopted by the [A]uthority, and which is established and implemented by the local EMS agency." (§ 1798, subd. (b).) Chapter 6 of the Act provides that the local EMS agency may, with the approval of the medical director, designate certain hospitals as "base stations" to provide medical direction to EMS providers as a means of administering the EMS system. (§ 1798.100.)

This two-tier system, as originally drafted, afforded no particular role for cities and fire districts in the EMS systems. In June of 1980, several months

before the EMS Act was passed, the League of California Cities wrote a letter to Senator Garamendi expressing its concern with Senate Bill No. 125. The letter stated in part: "Our primary concern lies with staffing levels, transportation, and system organization and management. We do not believe that city fire departments, where most paramedics are employed, are either capable of or should be making medically related decisions with respect to emergency medical services. We think the training standards and the medical direction of emergency medical paramedic programs should be under the direction of a medical director and we think that the county health officer is an appropriate position for that responsibility. However, we think that staffing levels of city paramedic programs, and the transportation and system organization[,] which we would assume means where paramedics are stationed, how they [are] dispatched with engine companies and the utilization of their time, whether they are otherwise full time firemen or not, etc., are fundamentally management decisions of the city fire department and ultimately the city council. We believe this because city taxpayers are financially supporting this program and city management is responsible for their efficient utilization. The city council is responsible for the level of service and the cost of the program, wholly unrelated to medical questions."

Shortly after receipt of the letter, Senate Bill No. 125 was amended to include section 1797.201, the key provision at issue in this case. (See Sen. Bill No. 125 (1979-1980 Reg. Sess.) as amended June 9, 1980.) That section, after subsequent amendments, and as finally enacted, requires that, "[u]pon the request of a city or fire district that contracted for or provided, as of June 1, 1980, prehospital emergency medical services, a county shall enter into a written agreement with the city or fire district regarding the provision of prehospital emergency medical services for that city or fire district. Until such time that an agreement is reached, prehospital emergency medical services shall be continued at not less than the existing level, and the administration of prehospital EMS by cities and fire districts presently providing such services shall be retained by those cities and fire districts, except the level of prehospital EMS may be reduced where the city council, or the governing body of a fire district, pursuant to a public hearing, determines that the reduction is necessary. [¶] Notwithstanding any provision of this section the provisions of Chapter 5 (commencing with Section 1798) shall apply." (§ 1797.201.)

In 1984, the EMS Act was amended (see sections 1797.6, 1797.85, and 1797.224) for the purpose of authorizing local EMS agencies to grant exclusive operating areas to private EMS providers such as ambulance companies. Such authorization was necessary to immunize the agencies from liability under the United States Supreme Court's then recent decision

holding that local governments granting monopolies would not be exempt from antitrust laws unless they acted pursuant to " 'clearly articulated and affirmatively expressed' " state policy. (*Community Communications Co.* v. *Boulder* (1982) 455 U.S. 40, 51 [102 S.Ct. 835, 840-841, 70 L.Ed.2d 810].) Section 1797.224, placed in chapter 4 of the EMS Act pertaining to local administration, provides in part that "[a] local EMS agency may create one or more exclusive operating areas in the development of a local [EMS] plan . . . . A local EMS agency which elects to create one or more exclusive operating areas in the development of a local plan shall develop and submit for approval to the authority, as part of the local EMS plan its competitive process for selecting providers and determining the scope of their operations. . . . Nothing in this section supersedes section 1797.201."

With this background in mind, we turn to the present case.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The present case involves essentially four parties, the City, the County, the Inland Counties Emergency Medical Agency (ICEMA), and Courtesy Services of San Bernardino, Inc. (Courtesy). It appears that until recently, these parties have coexisted rather harmoniously in the provision of emergency medical services of various kinds in the City. Since 1948, Courtesy has been the sole provider, with some exceptions discussed below, of emergency ambulance transport services in the City under the County's authorization. At some point prior to 1975, and virtually continuously thereafter, Courtesy also provided paramedic, advanced life support services within the areas served by its ambulances.

Beginning in 1975, the City's fire departments staffed some of its fire engines with firefighter/paramedics who were capable of providing advanced life support services, but did not provide ambulance transport; for such transport, the City still relied on Courtesy. None of the parties dispute that, as of June 1, 1980, the critical date under section 1797.201, the City was providing paramedic services within its borders. The City also established a "dispatch center" that dispatched all EMS providers within the City.

Sometime after the EMS Act became effective in 1981, the County, together with the Counties of Mono and Inyo, created the joint powers agency named ICEMA as the local EMS agency for regulation of emergency medical services within the three-county area. According to the joint powers agency agreement, the Board of Supervisors of the County was to be the governing board of ICEMA. In 1985 the County created what it designated as an "Emergency Medical Services Plan" for the County of San Bernardino,

and what was in fact a plan for the division of the County into various exclusive operating areas assigned to different ambulance companies, pursuant to section 1797.224. This EMS plan continued Courtesy's operation as sole ambulance provider in the City.

During the period of coexistence between the County, ICEMA, Courtesy, and the City, the City fire department and Courtesy were dispatched at the same response level. In the parlance of emergency medical services, "response level" refers to the urgency of the response to a medical emergency, either "Code Three" (emergency driving techniques, warning lights, lamp and sirens) or "Code Two" (routine driving procedures), depending on the nature of the emergency. When both were dispatched, the practice was for the first responder arriving on the scene to assume responsibility for patient care until the patient was ready for ambulance transport to the base hospital. The City, for its part, did not charge its residents for the paramedic services that it provided, although Courtesy did charge for both paramedic and ambulance services according to a fee schedule authorized by the County.

In 1991 the City initiated two changes that have given rise to the present controversy. First, the City began to charge for its paramedic services, using both a flat fee subscription plan and a fee for service charged to nonsubscribers. The reason given for this change was to raise revenue for the City, ostensibly to defray the costs of paramedic services. Second, shortly after the commencement of its new fee policy, the City initiated a new dispatch policy. Its dispatcher was no longer to dispatch the City fire department and Courtesy at the same response level. Rather, the City paramedics were to be dispatched at the more urgent Code Three, while Courtesy would be dispatched at Code Two, making it more likely that the City would arrive on the scene of the emergency first. City officials gave two reasons for the changes in the dispatch policy in their communications with the County: First, there had been complaints from those enrolled in its new subscription program who had received paramedic services from Courtesy and had been charged separately for those services, despite the subscription fee they had paid to the City. Second, dispatching both emergency medical service providers at a Code Three response level would needlessly jeopardize the safety of City residents, since a Code Three response presented a greater possibility of traffic accidents caused by EMS providers hurrying to the scene of the emergency.

In correspondence to City officials, the County medical director and other County officials objected to this new dispatch policy. They claimed that the deliberate delay in the arrival of Courtesy paramedic and ambulance services would put at greater risk those in need of such services. They also contended

that the City's motivation for the change in policy was primarily financial, i.e., to maximize the revenue-generating potential of paramedic services. As a result, the County medical director issued two protocols under what he asserted was his medical control authority pursuant to chapter 5 of the EMS Act. The first protocol is entitled "Responsibility for Patient Management" (the Patient Management Protocol) and mandates, among other things, that "[i]n the event that both public and private emergency medical care personnel arrive on the scene with the same qualifications, patient management responsibility will rest with the first to arrive." The second protocol is entitled "Emergency Medical Response Vehicle Dispatch" (the Dispatch Protocol) and states, in pertinent part, "[w]henever, in response to a request for medical emergency pre-hospital services, an EMS telecommunicator (dispatcher) dispatches a public safety responder to the scene, the EMS telecommunicator (dispatcher) shall also simultaneously dispatch an ambulance responder . . . at the same level of vehicle response mode so as to insure the shortest response time." The City took the position that it was not obliged to obey these protocols.

In December 1991, the County and ICEMA commenced the instant action against the City. The Authority and Courtesy later intervened on behalf of the County and ICEMA. Apple Valley Fire Protection District, Barstow Fire Protection District, Chino Valley Independent Fire District, and the Cities of Rialto and Victorville (collectively, defendant-interveners) intervened on behalf of the City. According to the County and ICEMA's first amended complaint, the City violated the Patient Management and Dispatch Protocols by refusing to allow privately employed paramedics who arrive first on the scene of medical emergencies to begin patient care, by taking patient control away from such paramedics, and by delaying the arrival of ambulance responders.

Based on the City's purported failure to comply with the Patient Management and Dispatch Protocols, the County and ICEMA sought both declaratory and injunctive relief against the City. Eventually, the City and defendant-interveners filed a joint motion for summary judgment. The County, ICEMA, and Courtesy responded with a joint cross-motion for summary adjudication as to the declaratory relief cause of action. The City, while not denying that it refused to follow the County/ICEMA protocols, claimed that these agencies were without authority to subject it to such protocols.

The trial court granted the City and defendant-interveners' motion for summary judgment. It denied the cross-motion for summary adjudication, except as to the City's right to enter into contracts for ambulance transport services. As to that issue, it ruled that if the City desired to contract for

ambulance transport services in excess of existing levels, it might do so only by agreement with ICEMA. The County, ICEMA, Courtesy, and the Authority appealed from the ensuing judgment in favor of the City and defendant-interveners. The City and defendant-intervener Chino Valley Independent Fire District cross-appealed from the portion of the judgment relating to ambulance transport services.

As this litigation proceeded, the City announced its intention to resolve the conflicts between it and the County, ICEMA, and Courtesy by excluding Courtesy altogether from the City and assuming exclusive operation of ambulance services itself. The trial court's ruling prohibited the City from following this course. While the appeal was pending, Courtesy and the City entered into an agreement on May 1, 1995, whereby Courtesy would continue to provide exclusive ambulance services in the City. That agreement was automatically renewable on a year-to-year basis unless terminated at least 90 days prior to the expiration of the term. The City permitted the agreement to be renewed on May 1, 1996.

The Court of Appeal affirmed the judgment of the trial court, except that it struck down the trial court's restriction of the City's ability to expand into ambulance transport services. The Court of Appeal determined that the City, as a section 1797.201 provider, enjoys the right to retain administration of its own prehospital emergency medical services indefinitely and need not integrate its operations into ICEMA's emergency medical services system. Based on this determination, the Court of Appeal went on to hold that the City has the right to select and regulate other providers operating within its geographic boundaries, the right to increase the level and change the type of prehospital emergency medical services it provides, and no obligation to comply with either the Patient Management or Dispatch Protocols.

We granted the County, ICEMA, and Courtesy's[1] petitions for review. Meanwhile, in October 1996, the City's common council voted to commence ambulance services within the City and written notice was given to Courtesy that their agreement for the continued provision of such services would be canceled at the end of the term on May 1, 1997. Courtesy and the County, in a motion under Code of Civil Procedure section 923, requested this court to enjoin the City from expanding into ambulance services or from interfering

---

[1]Henceforth, for ease of reference, we will generally refer to these three petitioners collectively as "the County" and to the City and defendant-interveners collectively as "the City." Because ICEMA's governing board is also the County's board of supervisors, we will also refer the actions of ICEMA's as simply the County's.

We also note that although the Authority appeared on behalf of the County and ICEMA in both the trial court and the Court of Appeal, it did not file a petition for review and has not filed any briefing in this court.

with Courtesy's operations until we had decided this matter. We granted their motion.

## III. DISCUSSION

### 1. Section 1797.201 as a "Transitional" Provision

Before commencing our discussion of the issues, we note that what is *not* at issue in this case is whether the EMS Act has a preemptive effect on local legislation. Notwithstanding the Court of Appeal's and the County's extensive discussion of this issue, it appears incontrovertible the EMS Act preempts conflicting local ordinances and regulations, a point the City concedes. The question is not one of preemption, but statutory interpretation: to what extent does the EMS Act in general, and section 1797.201 in particular, grant authority over the provision of EMS services to counties and local EMS agencies alone, and to what extent does the statutory scheme permit qualifying cities and fire districts to share this authority? This central question, present in several different forms, is the focus of this case.[2]

The County and its amici curiae[3] contend that section 1797.201 is merely a transitional provision, and that cities and fire districts claiming to exercise section 1797.201 rights must request and enter into agreements with counties or local EMS agencies regarding the provision of emergency services, or else lose the right to operate any emergency medical services at all. In other words, a request by cities and fire districts to enter an EMS agreement with counties is a precondition for the continuing exercise of their control over such services. While we agree that section 1797.201 is "transitional" in the sense that there is a manifest legislative expectation that cities and counties will eventually come to an agreement with regard to the provision of emergency medical services, we disagree that the statute can be construed to terminate a city's or fire district's right to administer such services if it fails to request or enter into an agreement with a county by a certain date.

Our reasons for rejecting the County's construction are several. First, the literal language of section 1797.201 does not support this construction. As set forth above, the first sentence of section 1797.201 reads: "Upon the request of a city or fire district that contracted for or provided, as of June 1,

---

[2] We also note that several of the parties and amici curiae requested that we take judicial notice of various items pursuant to Evidence Code section 452. Each of these requests is denied.

[3] For ease of reference, we will attribute the arguments of the County's amici curiae to the County. The arguments in this section were most explicitly developed in the amicus curiae brief of Monterey County.

1980, prehospital emergency medical services, a county shall enter into a written agreement with a city or fire district regarding the provision of prehospital emergency medical services for that city or fire district." Thus, section 1797.201 begins by giving cities and fire districts a choice of whether or not to request agreements with counties regarding emergency medical services. The first sentence raises a question—what happens if cities or fire districts do not request written agreements with the county?—that the second sentence answers. That sentence reads: "Until such time that an agreement is reached, prehospital emergency medical services shall be continued at not less than the existing level, and the administration of prehospital EMS by cities and fire districts presently providing such services shall be retained by those cities and fire districts . . . ." (*Ibid.*) Thus, until cities and fire districts reach agreements with counties, they are to retain administration of their prehospital EMS. The County would have us read the phrase "[u]ntil such time that an agreement is reached" as referring only to the time after which the agreement is requested by the city or fire district, and before the agreement is finalized. But there is no reason, according to the literal terms of the statute, to place such a limitation on that phrase. "Until such time that an agreement is reached" applies on its face equally to the period before an agreement is requested as to the period after the request but before entering into the agreement.

Second, the County's construction is deficient as much for what section 1797.201 does not say as for what it does. If the statute is supposed to provide that cities or fire districts that do not timely request an agreement with a county forfeit their right to provide any emergency medical services, as the County in essence asserts, why is the statute silent about the *time* given to perform this critical act? Section 1797.201 makes no mention of statutory deadlines. Instead, the statute contains open-ended phrases such as "upon request" and "until such time that an agreement is reached."

Third, the County's position that cities must request an agreement or lose their control over emergency medical services is incompatible with the overall scheme of the EMS Act. As explained above, the EMS Act provides that each county may develop an emergency medical services program (§ 1797.200) and that each local EMS agency shall "annually submit an emergency medical services plan for the EMS area to the authority." (§ 1797.254.) If a county establishes an EMS agency and develops an EMS plan, and a city or fire district finds that the plan proposed by the local EMS agency allows it to continue its control over local emergency medical services, that city or fire district would have no particular need to request an agreement with the County. In fact, the parties in this case have coexisted and cooperated without formal agreement under section 1797.201 until 1991.

Only when a county or local EMS agency attempts to assert its authority in a manner that is contrary to the perceived interests of cities and fire districts would these latter agencies have the occasion to decide whether they wish to formally assert against a county their section 1797.201 rights. If they do assert such rights, then it is illogical that this assertion must come in the form of a "request" for an agreement if the cities or fire districts seek nothing other than a preservation of the status quo. Even under the County's view that a request for an agreement is a precondition to the exercise of section 1797.201 rights, such a request would be meaningless, since it would be for an agreement to do something—continue to provide EMS—that these cities and fire districts would then have the right to do without an agreement under section 1797.201. Rather than adopt this illogical reading of the statute, we conclude that under section 1797.201 a county may not contravene the authority of eligible cities and fire districts to continue the administration of their prehospital EMS without the latter's consent, either through acquiescence or through formal agreement.

The County argues that cities and fire districts not only must request an agreement with the County but also must bargain in "good faith" to achieve an agreement. The imposition of such a duty is without support in the language of section 1797.201 or any other part of the EMS Act. Moreover, enforcement of this good faith standard in the negotiations between counties and cities and fire districts—in which each agency endeavors to act in the best interests of its own residents—would entail an untenable judicial intervention in political and policy matters of government agencies. We can discern no indication that the Legislature intended to impose any such duty or authorize any such intervention.

The County claims that its construction of section 1797.201 finds support in section 1797.178, which states in pertinent part that "[n]o person or organization shall provide advanced life support or limited life support unless that person or organization is an authorized part of the emergency medical services system of the local EMS agency . . . ." But section 1797.178 does not state that an EMS provider must be authorized *by* the local EMS agency, but merely that it must be "an authorized part of the EMS system." Under section 1797.201, the cities' and fire districts' authorization to provide EMS comes directly from statute, rather than from the local EMS agency. Thus, all parties agree that in the period before entering an agreement, section 1797.201 cities and fire districts may retain administration of their own EMS services, section 1797.178 notwithstanding. Where the County errs is in the insupportable assertion that the "pre-agreement" period contemplated by section 1797.201 is of limited duration.

It is true that the phrase "[u]ntil such time that an agreement is reached" does indeed suggest an intent on the part of the legislative drafters that

agreements between cities and counties be reached, and that this "pre-agreement" period would be temporary. As we have seen, the EMS Act aims to achieve integration and coordination among various government agencies and EMS providers, and the Legislature likely contemplated that section 1797.201 cities and fire districts would eventually be integrated into local EMS agencies. But the statute makes clear that these cities and fire districts must be integrated through voluntary agreement, and there is no statutory deadline imposed for requesting or reaching such agreement.

Thus, the City in this case retains its right to administer prehospital EMS within its borders. This administrative control, however, is subject to significant constraints. It is to these constraints that we now turn our attention.

### 2. *Medical Control*

We consider now the question whether the County's issuance of the Patient Management and Dispatch Protocols was a valid exercise of its authority. As noted, section 1797.201 states that "[n]otwithstanding any provision of that section, the provisions of Chapter 5 (commencing with Section 1798) shall apply" and chapter 5 is entitled "Medical Control." Section 1798, subdivision (a) (hereafter section 1798(a)), provides that the "medical direction and management of an emergency medical services system shall be under the medical control of the medical director of the local EMS agency. This medical control shall be maintained in accordance with the standards of medical control established by the authority [i.e., the state authority]." ■■ The Court of Appeal concluded that the exercise of "medical control," as used in section 1798(a), did not authorize the County to issue protocols regarding dispatch and patient management, at least not protocols that would subordinate cities and fire districts with section 1797.201 rights.

We disagree. The Court of Appeal came to its conclusion in spite of the broad language of section 1797.220 concerning medical control of the EMS system. That section states: "The local EMS agency, using state minimum standards, shall establish policies and procedures approved by the medical director of the local EMS agency to assure medical control of the EMS system. The policies and procedures approved by the medical director may require basic life support emergency medical transportation services to meet any medical control requirements including *dispatch*, patient destination policies, *patient care guidelines*, and quality assurance requirements." (*Ibid.*, italics added.) The Court of Appeal concluded, and the City now argues, that section 1797.201 makes cities and fire districts subordinate to the provisions of chapter 5, whereas section 1797.220 appears in chapter 4 in the context of

"basic life support" services, and therefore the meaning of "medical control" in section 1797.220 is irrelevant to determining the meaning of the same phrase in section 1798(a).

Such an argument misses the mark. Although section 1797.220 does not apply directly to section 1797.201 providers, it does elucidate the range of matters considered within the realm of "medical control" in chapter 5. Section 1798 itself does not define "medical control." The "definition" of medical control in section 1797.90 merely states that medical control "means the medical management of the emergency medical services system pursuant to the provisions of Chapter 5 (commencing with Section 1798)." Section 1798(a), in fact, leaves the formulation or definition of "medical control" up to the Authority's regulatory power, declaring that "this medical control shall be maintained in accordance with standards for medical control established by the authority." Regulations promulgated by the Authority pursuant to that section do not define medical control either. It is therefore reasonable to consult section 1797.220, where the term "medical control" is also used, to discern its meaning elsewhere in the EMS Act. It is elementary that, absent indications to the contrary, "a word or phrase . . . accorded a particular meaning in one part or portion of the law, should be accorded the same meaning in other parts or portions of the law . . . ." (*Miranda* v. *National Emergency Services, Inc.* (1995) 35 Cal.App.4th 894, 905 [41 Cal.Rptr.2d 593].) The language of section 1797.220 makes clear that the Legislature conceived of "medical control" in fairly expansive terms, encompassing matters directly related to regulating the quality of emergency medical services, including policies and procedures governing dispatch and patient care.

Nor do we find persuasive the City's contention that the two protocols at issue pertain not to medical treatment, but to administrative matters such as the "management and use of city dispatch equipment, city dispatchers, . . . city fire department personnel, [and] . . . administration of transportation, . . . not medical treatment." If the protocols dealt with purely internal administrative matters, such as the level and deployment of staff, then the City may be correct that such protocols would not be enforceable against it, even if they affected medical matters. It is with such internal matters that the California League of Cities seemed primarily concerned in its letter to Senator Garamendi preceding the inclusion of section 1797.201, quoted above, and its mention of "dispatch" appears to refer to internal dispatch policies. The protocols in question, however, pertain to the speed with which EMS providers other than the City will be dispatched to the scene of an emergency, and how the various EMS providers will interact at the emergency scene. As such, these protocols are consistent with the coordinating

function the EMS Act envisages for local EMS agencies. Moreover, both of these protocols are highly relevant to the provision of emergency medical care, affecting the speed and effectiveness of the response to medical emergencies. In light of the language of section 1797.220 and the overall purpose of the EMS Act, we conclude that the issuance of the two protocols is within the scope of the local EMS agency's ability to exert medical control over the EMS system.

The City contends that a view of the relevant regulations makes clear that "medical control" was intended to be confined strictly to such higher-level policy matters as the establishment of certification standards and training programs for paramedics, or emergency treatment procedures implemented by base hospitals, rather than matters of coordination with which the two protocols in question are concerned. But the regulations reveal no such limitation. Section 1798, subdivision (b), mandates that EMS agencies, in order to exert medical control, must comply with "the minimum standards adopted by the authority." The administrative regulations define those minimum standards. For example, section 100170 of title 22, California Code of Regulations, relates to the medical control of emergency medical technician-paramedics (EMT-P) and states in part that "[t]he medical director of the local EMS agency shall establish and maintain medical control in the following manner: [¶] (a) Prospectively, by assuring the development of written medical policies and procedures, to include *at a minimum*: [¶] . . . [¶] (2) Local medical control policies and procedures as they pertain to the EMT-P base hospitals, EMT-P service providers, EMT-P personnel and the local EMS agency." (Italics added.) Medical control is also to include, at a minimum, "[c]riteria for initiating specified emergency treatments" (Cal. Code Regs., tit. 22, § 100170, subd. (a)(3) & (4)), procedures to be followed for determining when a patient is not to be transported to a hospital (Cal. Code Regs., tit. 22, § 100170, subd. (a)(5)), and requirements for the review and disposal of patient care records (Cal. Code Regs., tit. 22, § 100170, subd. (a)(6)). An almost identical regulation pertaining to other emergency medical technicians is to be found in title 22 of the California Code of Regulations, section 100128.

Thus, title 22 of the California Code of Regulations, sections 100170 and 100128 set forth only the minimum standards for medical control. Moreover, these regulations broadly mandate that the local EMS agency formulate medically related policies and procedures to govern EMS providers among others. (Cal. Code Regs., tit. 22, §§ 100170, subd. (a)(2), 100128, subd. (a)(2).) As such, these regulations do not support the City's restrictive reading of the term "medical control."

■ The Court of Appeal's misconception of the medical control power was based in part on its misinterpretation of section 1798.6. Subdivision (a)

of that section provides that "[a]uthority for patient health care management in an emergency shall be vested in that licensed or certified health care professional, which may include any paramedic or other prehospital emergency personnel, at the scene of the emergency who is most medically qualified specific to the provision of rendering emergency medical care." (§ 1798.6, subd. (a).) Subdivision (c) states that "[n]otwithstanding subdivision (a), authority for the management of the *scene* of an emergency shall be vested in the appropriate public safety agency having primary investigative authority." (§ 1798.6, subd. (c), italics added.) The Court of Appeal found that subdivision (c) overrode subdivision (a), thereby undermining the authority of the local EMS agency to issue a protocol against the City's fire department regarding management of the emergency scene. But the term "management of the scene" in subdivision (c) obviously refers to nonmedical management, and therefore vests authority in law enforcement personnel, whose function it is to exclude bystanders, reroute traffic, etc. This is quite distinct from the "patient health care management" referred to in subdivision (a), which pertains to the coordination of health care personnel. The Patient Management Protocol at issue here was consistent with subdivision (a) and was not in any sense undermined by subdivision (c).

The Court of Appeal also concluded that the County's Patient Management Protocol conflicts with section 1798.6, subdivision (b), which provides that "[i]f any county desires to establish a unified command structure for patient management at the scene of an emergency within that county, a committee may be established in that county comprised of representatives of the agency responsible for county emergency medical services [and other government agencies] . . . ." The court held that the local EMS agency's Patient Management Protocol in effect establishes a unified command structure without using the statutory apparatus provided in section 1798.6, subdivision (b). We disagree. Although the term is not defined in the statute, a "unified command structure," to be established by representatives of different government agencies, suggests the institution of some sort of formal hierarchy based on the rank or affiliation of the personnel in question. A protocol such as the one devised by the County, which simply directs that whichever qualified emergency medical personnel arrives at an emergency scene first will have primary patient management responsibilities, is hardly the establishment of a "unified command structure," but is more accurately an arrangement in lieu of a formal structure.

In short, the Patient Management Protocol at issue in this case is consistent with section 1798.6. The validity of this protocol and the Dispatch Protocol is also confirmed by section 1797.220 and by the overriding purpose of the EMS Act to afford some measure of coordination and

integration to the provision of emergency medical services. We therefore hold these protocols are not unlawful, and the City is obliged, under section 1797.201, to follow them.

### 3. *Ability of Cities and Fire Districts to Expand the Scope of Their Services*

■ The final question is whether cities and fire districts are entitled to expand their services beyond what they had historically provided in 1980, as the City is proposing to do with ambulance services. As explained above, the City seeks to moot the controversy over the two protocols by excluding Courtesy, the County-authorized provider, from the City altogether, and by assuming exclusive operation of ambulance services. We conclude, contrary to the Court of Appeal, that the City cannot expand into new types of service it did not provide as of June 1, 1980.

The starting point of our analysis of the expansion issue is the statutory language of section 1797.201 itself. As discussed, the first sentence makes clear that cities and fire districts may only continue to provide emergency medical services if they have done so as of June 1, 1980. The second sentence then states: "Until such time that an agreement is reached, prehospital emergency medical services shall be continued at not less than the existing level, and the administration of prehospital EMS by cities and fire districts presently providing such services shall be retained by those cities and fire districts, . . ." (*Ibid.*) The critical language of the sentence is "administration of prehospital EMS by cities and fire districts presently providing such services shall be *retained* . . . ." (*Ibid.*, italics added.) The choice of the word "retained" implies that cities and fire districts are able to exercise the administrative control which they had already exercised as of June 1, 1980, for they can "retain" only those administrative powers that they already possessed. Thus, if the City controlled a certain domain of prehospital emergency medical services, such as paramedical services, then under section 1797.201 it would retain administrative control of those services. But since the City did not exercise administrative control over ambulance services as of 1980, leaving that to the County and the County-authorized provider, then the City cannot be said to "retain" administration of that function.

Such a construction is also consistent with the overall purpose of section 1797.201. The City contends that section 1797.201 was a broad recognition or authorization of autonomy in the administration of emergency medical services for cities and fire districts. The County contends that the purpose of the provision is merely to allow such entities to protect the investments they

had already made in various assets—emergency medical equipment, infrastructure, personnel, etc., at the time of the passage of the EMS Act. Neither position is entirely correct, but the County's is more nearly so. If section 1797.201 was the grant or recognition of local autonomy the City asserts that it was, then why would such autonomy be made conditional upon a city or fire district "contracting for or providing" EMS services as of June 1, 1980? And why make the critical date six months before the effective date of the act, if not to fix the status quo and preclude cities and fire districts from making or expanding their claim for local autonomy before the act went into effect? And why use the retrospective term "retained" rather than "exercised" or some other term conveying the outright grant of authority? In short, section 1797.201 appears to be a preservation of the status quo rather a broad authorization of municipal autonomy.

The County and its amici curiae are not correct, however, inasmuch as they suggest that this status quo is quantitative, i.e., that section 1797.201 fixes a ceiling of service above which the cities and fire districts cannot go. An earlier draft of section 1797.201, prior to its enactment, provided that before a city or fire district entered in an agreement, "the existing level and manner of prehospital emergency services shall be maintained." (Sen. Bill No. 125 (Reg. Sess. 1979-1980) as amended June 17, 1980.) This language was abandoned, and with it the notion that the cities or fire districts would be rigidly locked into a particular level of service. Such a scheme would likely have been unworkable, given that a city or fire district could remain without an EMS agreement for an indefinite period of time, and given the desirability of allowing cities and fire districts to change their staffing levels, equipment, and so forth in light of expanding needs and changing technologies. Instead, the more flexible notion of retaining "administration" was settled on, allowing cities and fire districts to maintain control of the services they operated or contracted for in June, 1980, and permitting them to make decisions as to the appropriate manner of providing those services.

A restrictive view of cities' and fire districts' ability to expand is also suggested by the phrase "[u]ntil such time as an agreement is reached" to characterize the period in which cities and fire districts are to retain their autonomy. As explained above, while section 1797.201 does not require cities and fire districts to enter an agreement by a particular time, the use of this phrase conveys the legislative goal that such agreements eventually be reached, and that these agencies be integrated into the local EMS system. To construe section 1797.201 to permit cities and fire districts not only to retain but also to expand their autonomy, moving even farther away from the goal of integration, appears to be contrary to the legislative intent implicit in section 1797.201.

The above interpretation is not only consistent with the language and purpose of section 1797.201 but also with the object of the EMS Act overall. As reviewed above, the Legislature's desire to achieve coordination and integration is evident throughout the act. One of the key provisions of the act is section 1797.204, which requires the local EMS agency to "plan, implement, and evaluate an emergency medical services system, in accordance with the provisions of this part, consisting of an organized pattern of readiness and response services based on public and private agreements and operational procedures." Section 1797.254 requires EMS agencies to "annually submit an emergency medical services plan for the EMS areas to the authority." Thus, one of the primary legislative objectives of the EMS Act is to enable local EMS agencies, in conjunction with the Authority, to plan, coordinate and implement a comprehensive EMS system.

In order to successfully plan and implement an EMS system, the local agency must be able to either control or predict, to some degree, the way in which emergency medical services will be provided within its jurisdiction. If the cities' and fire districts' authority within the EMS system is fixed at some historical point, then the local EMS agencies will be able to take this authority into account when they plan their EMS systems. But if, as the City asserts, a city or fire district that provided some emergency services prior to 1980 can expand at will its domain of control into any area of emergency medical services, and can at any moment withdraw from an EMS system to which it has hitherto given its de facto cooperation, then this would make it virtually impossible for local EMS agencies to carry out those planning functions. Therefore, although the statutory language is not free from ambiguity, reading the phrase "administration . . . shall be retained" in a fairly narrow fashion is not only consistent with the language and manifest purpose of section 1797.201 but also with the basic legislative aims of the EMS Act.

The validity of our construction of section 1797.201 is confirmed by section 1797.224, which provides, in part, that "a local EMS agency may create one or more exclusive operating areas in the development of a local [EMS] plan . . . ." Thus section 1797.224 speaks only of local EMS agencies, not cities and fire districts, creating an emergency operating area (EOA). As the Legislature recognized, creating an EOA is an important administrative tool for designing an EMS system, for it allows these agencies to plan and implement EMS systems that will meet the needs of their constituencies and at the same time ensure that the EMS providers with which they contract have a territory sufficiently populated to make the provision of these services economically viable. (See Toma, *The Decline of Emergency Services Coordination in California: Why Cities Are at War With Counties Over Illusory Ambulance Monopolies* (1994) 23 Sw.U. L.Rev. 285,

289, fn. 25.) As one federal court has recognized, the EMS Act "evidences an intent to 'displace unregulated competition' in a field where quality and cost control are vitally important state interests." (*Mercy-Peninsula Ambulance* v. *County of San Mateo* (N.D.Cal. 1984) 592 F.Supp. 956, 963.) Indeed, given the fact that counties are the governmental agencies with primary financial responsibility for providing indigents with emergency medical services (see *City of Lomita* v. *Superior Court* (1986) 186 Cal.App.3d 479, 481-482 [230 Cal.Rptr. 790]), it is understandable that the Legislature vested in a county-affiliated agency the ability, through the creation of EOA's, to ensure the financial soundness of EMS systems.

The ability to create EOA's recognized in section 1797.224 would be rendered largely futile, however, if cities or fire districts that had no history of operating ambulance services were able at any time to expand into these services, thereby partially nullifying an existing EOA. Thus, construing section 1797.201 in light of section 1797.224 and the system of EOA's that it envisions, we conclude section 1797.201 was designed to confine EMS operations by cities and fires districts to those types in which they were historically engaged as of June 1, 1980.

Nor does the final sentence of section 1797.224 that "[n]othing in this section supersedes Section 1797.201" argue in favor of the City's position. Rather, the reference to section 1797.201 is most reasonably understood as providing that a local EMS agency's ability to create EOA's may not supplant the cities' or fire districts' ability to continue to control EMS operations over which they have historically exercised control. Nothing in this reference to section 1797.201 suggests that cities or fire districts are to be allowed to expand their services, or to create their own exclusive operating areas.

The City claims support for its own expansive interpretation of its authority under section 1797.201 in the Fire Protection District Law of 1987 or the Bergeson Fire District Law (§ 13800 et seq. (hereafter Fire District Law).) This law, enacted in 1987 to supersede the previous fire district law, makes the legislative finding that "the local provision of fire protection services, rescue services, emergency medical services, hazardous material emergency response services, ambulance services, and other services relating to the protection of lives and property is critical to the public peace, health, and safety of the state. Among the ways that local communities have provided for those services has been the creation of fire protection districts. Local control over the types, levels, and availability of these services is a long-standing tradition in California which the Legislature intends to retain.

Recognizing that the state's communities have diverse needs and resources, it is the intent of the Legislature in enacting this part to provide a broad statutory authority for local officials." (§ 13801.) Section 13862 further provides that "[a] district shall have the power to provide the following services: [¶] . . . [¶] (c) [e]mergency medical services; [¶] . . . [¶] (e) [a]mbulance services pursuant to division 2.5 (commencing with section 1797)."

The Fire District Law does not, however, support the City's position. Our duty is to harmonize statutes wherever possible. (*Building Material & Construction Teamster's Union* v. *Farrell* (1986) 41 Cal.3d 651, 665 [224 Cal.Rptr. 688, 715 P.2d 648].) We note first that the Fire District Law applies only to fire districts, not cities. More significantly, although the Fire District Law declares that the local provision of services by the fire district is a desirable end, section 13862 specifically provides that ambulance services are to be provided in accordance with the EMS Act. Although section 13862, subdivision (c), does not explicitly state the same with regard to emergency medical services, we do not understand this subsection to be an exemption of fire districts from the EMS Act, or an implied partial repeal of section 1797.201. We conclude rather that the provision of emergency medical services under section 13862, subdivision (c), was not explicitly made subject to the EMS Act because the applicability of the act to such services, unlike to ambulance services, was self-evident. Thus, section 1797.201 indubitably limits fire districts' ability to provide EMS, and indeed deprives such districts of the ability to provide these services altogether without the consent of the local EMS agency if the districts did not provide or contract for such services as of June 1, 1980, notwithstanding the Fire District Law's general authorization of fire districts as providers of emergency medical services. We therefore conclude that the enactment of the Fire District Law in 1987 did not modify the limitations that the EMS Act, enacted seven years earlier, had placed on fire districts, much less on cities. One of those limitations is on the ability of these agencies to expand into different types of emergency medical services.

■ Nor was the Court of Appeal correct in finding that section 1797.201 providers can unilaterally terminate the services of county providers with whom they had jointly operated paramedic services. Again, because section 1797.201 permits cities and fire districts to retain control of only those services that they had provided or contracted for as of June 1, 1980, a city or fire district that had only a concurrent jurisdiction with the county regarding the provision of emergency medical services may not expand its control by excluding the county provider. Furthermore, as we have seen, section 1797.224 gives the power to grant exclusive operating areas only to counties

and local EMS agencies, not to cities or fire districts. Thus, while cities and fire districts would be able to continue to administer their own emergency medical services operations, they would not be able to bar those that had historically provided such services under a county's or local EMS agency's auspices.

We hold therefore that the City, absent the County's consent, may not expand into ambulance services it did not provide as of June 1, 1980, nor exclude Courtesy, the county provider.[4]

## IV. DISPOSITION

The judgment of the Court of Appeal is affirmed in part, insofar as it ruled that the City has the right to continue to administer its own prehospital emergency medical services. The judgment of the Court of Appeal is reversed in part, insofar as it held that the City is not obligated to comply with the Dispatch Protocol and the Patient Management Protocol, and insofar as it held that the City may provide general ambulance services or other types of services not provided as of June 1, 1980. The cause is remanded to the Court of Appeal with directions to remand to the superior court for proceedings consistent with this opinion.

George, C. J., Kennard, J., Werdegar, J., and Chin, J., concurred.

**BAXTER, J.,** Concurring and Dissenting.—I respectfully dissent from the judgment insofar as it reverses the judgment of the Court of Appeal. I concur in the judgment insofar as it affirms that part of the judgment of the Court of Appeal holding that the City of San Bernardino (the City) retains the right to administer prehospital emergency medical services (EMS). I do not agree that the Legislature intended to give the local EMS agency authority over dispatch of ambulances within the City or that the Legislature intended to distinguish among the forms of prehospital emergency services over which a city retains administrative control and thereby to preclude the city from adding ambulance services to the services it was providing to its residents on June 1, 1980.

---

[4]The City contends that it engaged in some incidental ambulance transport, and in particular operated a four-wheel-drive ambulance to rescue hang gliders, hikers and others in the more remote parts of the City, and that it occasionally used ambulance transport from other jurisdictions under mutual aid agreements when Courtesy was not available. Yet it is undisputed that the City did not provide or contract for general ambulance services, and it conceded as much at oral argument. The fact that the City was engaged in specialized ambulance service does not alter our conclusion that it did not historically provide general ambulance services, and may not now provide these services without the County's or ICEMA's consent. The City may continue to provide specialized ambulance services without such consent.

In my view the opinion of Justice Hollenhorst for the Court of Appeal, the relevant portions of which are set forth below with additions in brackets and deletions reflected as [], correctly analyzes, and is faithful to the legislative intent underlying the EMS Act (Health & Saf. Code, § 1797 et seq.) and specifically Health and Safety Code section 1797.201 (unless otherwise indicated all references herein are to that code). As the Court of Appeal explained:

[]

2.  *Section 1797.220 and Related Sections.*

The County [of San Bernardino (hereafter the County)] [] argues that section 1797.220 establishes "the parameters under which a local EMS agency exercises the medical control necessary to carry out its regulatory task under Section 1798."

Section 1797.220 provides: "The local EMS agency, using state minimum standards, shall establish policies and procedures approved by the medical director of the local EMS agency to assure medical control of the EMS system. The policies and procedures approved by the medical director may require basic life support emergency medical transportation services to meet any medical control requirements *including dispatch*, patient destination policies, patient care guidelines, and quality assurance requirements." (Italics added.)

The City argues that section 1797.220 is inapplicable here because it is not part of the chapter on medical control commencing with section 1798.

[I] agree. Section 1797.220 is part of the article dealing with the local emergency medical services agency. It authorizes the agency to establish policies and procedures to assure medical control of the emergency medical services system. By its terms, it allows the agency to direct medical transportation providers, such as Courtesy [Services of San Bernardino, Inc. (hereafter Courtesy)], to comply with medical control requirements, including dispatch requirements. It does not authorize [the Inland Counties Emergency Medical Agency, hereafter] ICEMA[,] to impose requirements, including dispatch requirements on other service providers, including the City.

In addition, section 1797.220 does not apply to cities and fire districts that qualify under section 1797.201 because section 1797.201 expressly provides that cities and fire districts are subject only to the medical control provisions of section 1798 et seq.

[]

### 3. *Administration.*

Turning to the question of the definition of administration, [I] find statutes and precedent which help us define the nature of administration.

Historically, firefighting, police, and ambulance services have been considered to be municipal services or functions, administered by the local municipality. (Gov. Code, § 54980.) The legislative body of a city therefore has the power to contract for ambulance service for the residents of the city. (Gov. Code, § 38794.) These sections, enacted in 1978 and 1971, respectively, were not amended by the EMS Act. Similarly, a city has the power to contract for paramedic services. (*Saathoff* v. *City of San Diego* (1995) 35 Cal.App.4th 697 [41 Cal.Rptr.2d 352].)

The Fire Protection District Law of 1987 clearly states a legislative intent to preserve local fire district control over emergency medical services and specifically authorizes fire districts to provide emergency medical services and ambulance services pursuant to the EMS Act. (§ 13862.) The legislative intent is stated as follows: "The Legislature finds and declares that the local provision of fire protection services, rescue services, emergency medical services, hazardous material emergency response services, ambulance services, and other services relating to the protection of lives and property is critical to the public peace, health, and safety of the state. Among the ways that local communities have provided for those services has been the creation of fire protection districts. Local control over the types, levels, and availability of those services is a long-standing tradition in California which the Legislature intends to retain. Recognizing that the state's communities have diverse needs and resources, it is the intent of the Legislature in enacting this part to provide a broad statutory authority for local officials. The Legislature encourages local communities and their officials to adapt the powers and procedures in this part to meet their own circumstances and responsibilities." (§ 13801.)

The [California Emergency Medical Services Authority [(hereafter Authority)] "agrees that providing emergency services, including medical, is a traditional municipal service." However, it seeks to differentiate between administration and regulation, arguing that this case concerns regulation, and that regulation has never been a municipal function.

In [my] view, the Legislature has not explicitly subjected the prehospital emergency medical services traditionally controlled by the cities and fire districts to county control or regulation except in the areas specifically stated in the EMS Act, most notably medical control and training and certification

standards for emergency care system personnel. Without such legislative authorization, the cities and fire districts that were historically providing such services remain free to administer prehospital emergency medical services in their territorial areas.

[]

### 4. *Conclusion.*

Taken together, [I] discern a legislative intent in section 1797.201 to allow cities and fire districts that were providing prehospital emergency medical services on June 1, 1980, to continue to administer prehospital emergency medical services within their territorial jurisdictions until a written agreement with the county and its emergency services agency is executed. [I] agree with [] the First District that the level of services refers "to such matters as the quantity of available staff, vehicles, equipment, etc. and/or to the type and character of available EMS services as constituting basic, advanced, or limited advanced life support . . . ." (*City of Petaluma* v. *County of Sonoma* [(1993)] 12 Cal.App.4th 1239, 1245 [15 Cal.Rptr.2d 617].)

Thus, the County can only impose medical control on the City. The County cannot require the City to provide equipment or personnel, and cannot intrude in such matters as the staffing levels, the manner in which fire equipment, including fire equipment carrying paramedics, is deployed, and police or fire scene management. These matters relate to the amount, or level, of service to be provided, and they are entrusted to the city or fire districts as the historic providers of those services because it is the city or fire district taxpayers who must pay for them. These levels of services may be increased or decreased by the city council or fire district governing body as described in section 1797.201. In addition, if the County wishes to "establish a unified command structure for patient management at the scene of an emergency" it must do so by a committee which is formed by a joint powers agreement and which includes City and fire district representatives. (§ 1798.6, subd. (b).)

While decisions by the City relating to the level of service obviously can have a significant effect on the quality of patient care, the broad definition of medical control urged by the County focuses solely on the quality of patient care and disregards the fiscal implications of such decisions. For example, a very high level of patient care would be achieved if an ambulance and paramedic were stationed on every City block. However, the costs to the City's taxpayers would be prohibitive. If the County were able to mandate

such level of service under the guise of exercising medical control, it would be able to impose excessive costs on the City and it would not be accountable to the City's taxpayers for its decisions. [I] find no such legislative intent and reject the County's argument that it can impose dispatch standards on a city which would require the City to provide sufficient equipment to reduce response time to a time prescribed by the County.

[I] therefore conclude that medical control relates to the quality of service to be provided by responding personnel. The Authority's regulations confirm this by providing detailed standards for the training and qualification of emergency medical technicians and paramedics. The regulations also relate to the development of policies and procedures for the coordination of efforts between emergency personnel and base hospitals. Thus, all emergency technicians and paramedics, whether employed by the City or Courtesy, are subject to the same training and certification standards, and they coordinate with the base hospital in the same manner.

[]

[I] agree with the trial court that medical control involves patient care or medical management within the emergency services system. (§ 1797.90.) The term "medical control" thus includes control over the base hospital system pursuant to section 1798.100, and all other matters specified in section 1798 et seq. Training and certification standards are also under the control of the Authority, the County, and ICEMA.

The term "administration" refers to all other aspects of the emergency services system historically within the jurisdiction of a city or fire district, including the selection and retention of emergency health care providers. If the City does not act in these areas, the County may designate providers as stated in section 1797.224. However, "[n]othing in [that] section supersedes Section 1797.201." (§ 1797.224.)

Accordingly, the trial court correctly determined that the City was not obligated to comply with either the Patient Management Protocol or the Dispatch Protocol promulgated by the County/ICEMA.

[]

The County also contends that, even if the County cannot regulate the City, it can regulate or control the activities of other emergency services providers, such as Courtesy, within the City, and, conversely, that the City has no power to regulate such providers.

The County specifically attacks the trial court's finding that "[b]ecause the City of San Bernardino and intervenors retain management and control over the pre-hospital EMS within their jurisdictional boundaries, the County of San Bernardino-ICEMA have no jurisdiction to dispatch, regulate, or authorize providers to operate within said city or fire district, except as otherwise agreed by the County of San Bernardino-ICEMA and the City of San Bernardino or intervenors."

The County argues that the trial court erred because section 1797.201 should be interpreted to refer only to the administration of services actually provided by the City, and not the administration of all prehospital emergency services in the City. Thus, it concludes that it has the authority to continue to regulate Courtesy and other private providers within the City.

The County also argues that the trial court's interpretation defeats the statutory scheme of section 1797.224. Under that section a local emergency medical services agency may create exclusive operating areas in the development of a local plan, and may select providers to provide service within those exclusive operating areas. Since the County has selected Courtesy to provide ambulance transportation services within an exclusive operating area consisting of the City, it finds that City regulation of Courtesy conflicts with section 1797.224.

[I] disagree. Section 1797.224 acts primarily to grandfather historic private providers by protecting them from competitive bidding requirements: "No competitive process is required if the local EMS agency develops or implements a local plan that continues the use of existing providers operating within a local EMS area in the manner and scope in which the services have been provided without interruption since January 1, 1981."

Although section 1797.224 was enacted four years after section 1797.201, it expressly states that nothing in the section supersedes section 1797.201. Accordingly, if the City may regulate other providers under section 1797.201, [I] find no conflict with section 1797.224.[]

[I] thus return to section 1797.201. The second sentence of that section states: "Until such time that an agreement is reached, prehospital emergency medical services shall be continued at not less than the existing level, and *the administration of prehospital EMS by cities and fire districts presently providing such services shall be retained by those cities and fire districts*, except the level of prehospital EMS may be reduced where the city council, or the governing body of a fire district, pursuant to a public hearing, determines that the reduction is necessary." (Italics added.)

The term "emergency medical services" is defined by section 1797.72 to mean "the services utilized in responding to a medical emergency."

As discussed above, these services have historically included the provision of prehospital emergency medical services, including ambulance and paramedic services by cities and fire districts. [I] think that section 1797.201 confirms the historic right of cities and fire districts to continue to provide all prehospital emergency medical services until agreement is reached with the County. Accordingly, the method of provision of those services by a city or fire district, whether directly or by contract, is within the authority of the city or fire district that was providing those services on June 1, 1980, and is not limited to services actually provided at that time. In other words, the cities and fire districts *retain* authority to administer the services they were historically providing and administering until the county takes over the providing of such services by written agreement.

[]

[] [T]he City has not historically provided significant ambulance transport services. Thus, the County properly allowed Courtesy to provide such services within an exclusive operating area consisting of the City. However, if the City chooses to provide its own ambulance transport services, directly or through contract with other providers, including Courtesy, the City has the authority to provide and administer those services.

[]

[] [I] interpret section 1797.201, second sentence, to mean that the city or fire district that historically provided prehospital emergency medical services retains the power to administer all prehospital emergency medical services in the city or fire district until a written agreement is made with the county. (§ 1797.72.) As [] also discussed above, the power to provide ambulance services, directly or through provider contracts, is an historic municipal function. (Gov. Code, §§ 38794, 54980.) The power to administer all prehospital emergency medical services includes the power of a city or fire district to enter the ambulance transport business.

BROWN, J., Dissenting.—

I. INTRODUCTION

The majority adopts a schizophrenic construction of the Emergency Medical Services System and the Prehospital Emergency Medical Care Personnel

Act (the EMS Act). (See Health & Saf. Code, § 1797 et seq.; all further statutory references are to this code unless otherwise indicated.) On the one hand, the majority correctly and repeatedly stresses "the Legislature's desire to achieve coordination and integration is evident throughout the [EMS] [A]ct" and the "manifest legislative expectation [is] that cities and counties will eventually come to an agreement with regard to the provision of emergency medical services." (Maj. opn., *ante,* at pp. 922, 930; see also *id.* at pp. 915, 924-925, 928-929.) On the other hand, the majority upholds as "essentially correct" the Court of Appeal's conclusion "that cities and fire districts that contracted for or provided prehospital emergency medical services as of June 1, 1980, can retain administration of such services indefinitely and need not fully integrate their operations into the systems of their county-designated local EMS agencies." (*Id.* at p. 913; see also *id.* at pp. 922, 924, 930.) In my view, nothing in the EMS Act supports this bizarre construction under which the Legislature is deemed to have given with one hand what it then takes with the other. Therefore, I respectfully dissent.

## II. DISCUSSION

### A. *The Transitional Nature of Section 1797.201*

All of the Court of Appeal's holdings are premised on its determination that section 1797.201 of the EMS Act allows a qualifying provider to retain administration of its own prehospital emergency medical services (hereafter sometimes EMS) on an ongoing basis and does not require it to integrate its operations into the system of its local EMS agency.[1] (See maj. opn., *ante,* at p. 921.) Although the majority agrees with this interpretation of the EMS Act (*id.* at pp. 922-925), I do not. Rather, I would hold that a section 1797.201 provider must integrate its operations into the system of its local EMS agency. If a section 1797.201 provider desires input as to the terms of

---

[1]Section 1797.201, the key provision at issue in this case, requires that "[u]pon the request of a city or fire district that contracted for or provided, as of June 1, 1980, prehospital emergency medical services, a county shall enter into a written agreement with the city or fire district regarding the provision of prehospital emergency medical services for that city or fire district. Until such time that an agreement is reached, prehospital emergency medical services shall be continued at not less than the existing level, and the administration of prehospital EMS by cities and fire districts presently providing such services shall be retained by those cities and fire districts, except the level of prehospital EMS may be reduced where the city council, or the governing body of a fire district, pursuant to a public hearing, determines that the reduction is necessary. [¶] Notwithstanding any provision of this section the provisions of Chapter 5 (commencing with Section 1798) shall apply."

Henceforth, for ease of reference, the term "section 1797.201 provider" refers to a city or fire district that contracted for or provided prehospital emergency medical services as of June 1, 1980, and that has not yet reached a written agreement with a participating county.

this integration, it must request a written agreement. Once an agreement is requested, both the section 1797.201 provider and the county involved must come to the table and bargain in good faith to arrive at a mutually acceptable agreement. The section 1797.201 provider retains administration of its own prehospital emergency medical services during the transitional period— namely, "[u]ntil such time that an agreement *is* reached." (See § 1797.201, *ante*, at p. 941, fn. 1, italics added.) If a section 1797.201 provider continues to provide prehospital emergency medical services without requesting a written agreement, its operations are automatically integrated into the system of its local EMS agency, but it is not entitled to any of the interim protections of section 1797.201.

In reaching a contrary conclusion, the Court of Appeal relied on what it deemed "the plain meaning of section 1797.201." According to the Court of Appeal, the first sentence of section 1797.201 (see *ante*, at p. 941, fn. 1) "merely requires a county to enter into a written agreement for the provision of emergency medical services upon request of a city or fire district. (Cal. Const., art. XI, § 8, subd. (a).) It thus preserves the right of an eligible city or fire district to cease providing prehospital emergency medical services and to contract with the county to provide such services for the city or fire district. . . . [I]t does not require the city or fire district to request such an agreement within any particular time, or at all." There are several problems with this interpretation of section 1797.201.

First, the constitutional provision cited by the Court of Appeal states, "[t]he Legislature may provide that counties perform municipal functions at the request of cities within them." (Cal. Const., art. XI, § 8, subd. (a).) By its own terms, the provision does not apply to fire districts.

Second, section 1797.201 cannot properly be interpreted as implementing the constitutional provision because it does not require counties to perform prehospital emergency medical services *for* cities and fire districts. Rather, it mandates that upon the request of a section 1797.201 provider "a county shall enter into a written agreement with the city or fire district *regarding* the provision of prehospital emergency medical services for that city or fire district." (See § 1797.201, *ante*, at p. 941, fn. 1, italics added.) The Legislature chose this terminology carefully, specifically amending an earlier version of the provision that would have required, "a county shall enter into a written agreement with the city or fire district *for* the provision of prehospital emergency medical services for that city or fire district." (Sen. Bill No. 125 (1979-1980 Reg. Sess.) as amended June 17, 1980, italics added.) Viewed in this light, the language of section 1797.201 is at least equally susceptible to an interpretation of the provision as transitional in nature.

Indeed, another Court of Appeal, although not expressly deciding the issue, observed that "[t]he plain meaning of section 1797.201 . . . . allows qualified cities to continue providing EMS services and retain administration thereof *in the interim* between its request for a written agreement with the county and the reaching of such an agreement." (*City of Petaluma* v. *County of Sonoma* (1993) 12 Cal.App.4th 1239, 1244 [15 Cal.Rptr.2d 617], italics added.)

Finally, and perhaps most importantly, as this court explained in *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727 [248 Cal.Rptr. 115, 755 P.2d 299], "the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.] Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." (*Id.* at p. 735.)

It is particularly important to focus on "the legislative intent apparent in the statute" (*Lungren* v. *Deukmejian, supra,* 45 Cal.3d at p. 735) when construing a statutory scheme as comprehensive as the EMS Act. As the majority properly acknowledges, the Legislature's intent to coordinate and integrate all activities relating to prehospital emergency medical services is apparent throughout the EMS Act. At the local level, the Legislature accomplished this coordination and integration by authorizing counties to designate local EMS agencies, which, once designated, are required to implement a single emergency medical services system within each of their respective jurisdictions. To permit the vast array of section 1797.201 providers to continue to operate their own emergency medical services fiefdoms on an independent and ongoing basis would eviscerate the Legislature's intent to achieve coordination and integration of the delivery of prehospital emergency medical services.

Construing section 1797.201 as transitional in nature is also "consistent with other provisions of the statute." (*Lungren* v. *Deukmejian, supra,* 45 Cal.3d at p. 735.) For example, section 1797.78 defines an emergency medical services system as "a specially organized *arrangement* which provides for the personnel, facilities, and equipment for the effective and coordinated delivery in an EMS area of medical care services under emergency conditions." (Italics added.) Likewise, sections 1797.204 and

1797.252 require a local EMS agency to implement its system "based on public and private *agreements*" and to "coordinate and otherwise facilitate *arrangements* necessary to develop the emergency medical services system." (Italics added.) And section 1797.178 expressly provides that "[n]o person or organization shall provide advanced life support or limited advanced life support unless that person or organization is an authorized part of the emergency medical services system of the local EMS agency . . . ." These provisions confirm that section 1797.201 should be interpreted as a transitional provision, requiring a section 1797.201 provider to integrate its operations into the system of its local EMS agency and permitting it to have input as to the terms of this integration if it requests a written agreement.

The City of San Bernardino (the City) and defendant-interveners (collectively, defendants) rely on *Vedder* v. *County of Imperial* (1974) 36 Cal.App.3d 654 [111 Cal.Rptr. 728], for the proposition that cities and fire districts are not "persons or organizations" within the meaning of section 1797.178. Defendants' reliance on *Vedder* is misplaced. In that case, the Court of Appeal concluded that a city and a county "are not 'persons' as defined by Health and Safety Code section 19." (36 Cal.App.3d at p. 662.) The court did not consider whether cities and fire districts were "organizations" for the purposes of section 1797.178. "Obviously, cases are not authority for propositions not considered therein." (*Roberts* v. *City of Palmdale* (1993) 5 Cal.4th 363, 372 [20 Cal.Rptr.2d 330, 853 P.2d 496].)

Defendants' construction of section 1797.178 as excluding cities and fire districts would completely undermine the Legislature's desire to create a single emergency medical services system within the jurisdiction of each local EMS agency. Moreover, under defendants' interpretation, cities and fire districts that do not qualify as section 1797.201 providers would elude the reach of the EMS Act altogether while those that do qualify would indisputably remain subject to the medical control provisions of chapter 5. (See § 1797.201, *ante*, at p. 941, fn. 1.) The resulting anomaly—that cities and fire districts that do not qualify for "grandfathering" would enjoy greater rights than section 1797.201 providers—would further fragment the delivery of prehospital emergency medical services.

Section 1797.224, added to the EMS Act in 1984, also counsels against the Court of Appeal's interpretation of section 1797.201. That section provides that "[a] local EMS agency may create one or more exclusive operating areas in the development of a local plan, if a competitive process is utilized to select the provider or providers of the services pursuant to the plan. No competitive process is required if the local EMS agency develops or implements a local plan that continues the use of existing providers

operating within a local EMS area in the manner and scope in which the services have been provided without interruption since January 1, 1981. . . . Nothing in this section supersedes Section 1797.201." (§ 1797.224; see also §§ 1797.85 [" 'Exclusive operating area' means an EMS area or subarea defined by the emergency medical services plan for which a local EMS agency, upon the recommendation of a county, restricts operations to one or more emergency ambulance services or providers of limited advanced life support or advanced life support."]; 1797.226 [special provision relating to exclusive operating areas in San Bernardino County; not at issue in this case].)

In construing a statutory scheme, "provisions relating to the same subject matter must be harmonized to the extent possible." (*Lungren* v. *Deukmejian, supra,* 45 Cal.3d at p. 735.) The Court of Appeal's construction of the EMS Act fails to harmonize sections 1797.201 and 1797.224. As a practical matter, its interpretation of section 1797.201 would all but eliminate the ability of counties and their local EMS agencies to create exclusive operating areas within the geographic boundaries of section 1797.201 providers because, were they to do so, the exclusive operating areas would be terminable at the whim of section 1797.201 providers. In the words of one of the defendant-interveners, "[a]lthough section 1797.224 permits counties to create exclusive operating areas, section 1797.224 does not supersede section 1797.201. If a city or fire district increases the level or manner of EMS and that creates a conflict with a private provider authorized under section 1797.224, then the private provider must give way to the city or fire district." The Court of Appeal acknowledged this effect of its ruling, explaining that "the City has not historically provided significant ambulance transport services. Thus, the County properly allowed Courtesy to provide such services within an exclusive operating area consisting of the City. However, if the City chooses to provide its own ambulance transport services, directly or through contract with other providers, including Courtesy, the City has the authority to provide and administer those services."

Properly harmonized with section 1797.201, the language of section 1797.224 strongly supports the notion that the former provision is transitional. By providing that "[n]othing in this section supersedes Section 1797.201," section 1797.224 confirms that a county's power to create exclusive operating areas cannot override agreements negotiated pursuant to section 1797.201. And, to the extent such agreements have not yet been finalized, it ensures that the subject of exclusive operating areas can be addressed up front in the written agreements between section 1797.201 providers and their respective counties. This construction brings certainty and stability to the delivery of prehospital emergency medical services.

Without such certainty and stability, counties would be unable to discharge their legal obligation to provide emergency ambulance transport services to their indigent residents, including those who live within the geographic boundaries of section 1797.201 providers, in any sort of predictable fashion. (See generally, *City of Lomita* v. *Superior Court* (1986) 186 Cal.App.3d 479 [230 Cal.Rptr. 790]; *City of Lomita* v. *County of Los Angeles* (1983) 148 Cal.App.3d 671 [196 Cal.Rptr. 221].)

In addition, defendants maintain that the legislative history of section 1797.201 supports the Court of Appeal's interpretation of the provision. They rely heavily on a June 2, 1980, letter from the League of California Cities to Senator Garamendi, the author of Senate Bill No. 125, the bill that became the EMS Act. In the letter, the league took issue with the provision that was to become section 1797.103 (see maj. opn., *ante*, at p. 915), noting that it "requires the state authority to develop planning and implementation guidelines for emergency medical service systems which address manpower and training, communications, transportation and system organization and management." The league complained "that staffing levels of city paramedic programs, the transportation and system organization which we would assume means where paramedics are stationed, how they [are] dispatched with engine companies and the utilization of their time, whether they are otherwise full-time firemen or not, etc., are fundamentally management decisions of the city fire department and ultimately the city council. We believe this because city taxpayers are financially supporting this program and city management is responsible for their efficient utilization. The city council is responsible for the level of service and the cost of the program, wholly unrelated to medical questions." Therefore, the league concluded that it "must oppose those aspects of SB 125 which remove from cities the authority to establish service levels, types of transportation, location and system organization to the extent that those components of the emergency medical services system are not, strictly speaking, medical questions."

Significantly, however, the Legislature's response to the league's concerns was not to amend section 1797.103. To the contrary, the Legislature retained the requirement that the state Emergency Medical Services Authority (the Authority) develop planning and implementation guidelines addressing, among other things, manpower and training, communications, transportation, and system organization and management. (See § 1797.103, maj. opn., *ante*, at p. 915.) The assurance that the Authority, counties, and local EMS agencies would not run roughshod over preexisting public providers was accomplished by the addition of section 1797.201 to the pending bill, which grants section 1797.201 providers the right to request and enter written agreements specifying the terms of their integration into the emergency medical services systems of their local EMS agencies. (See Assem.

Amend. to Sen. Bill No. 125 (1979-1980 Reg. Sess.) June 9, 1980.) Nothing in the legislative history of the EMS Act suggests that the provision was intended to permit section 1797.201 providers to operate their own emergency medical services systems on an independent and ongoing basis. In fact, the amendment adding section 1797.201 was not even mentioned in the Legislative Counsel's Digest, which continued to provide, as it did in the final version of the EMS Act, that local EMS agencies "would be responsible for administration of emergency medical services." (Legis. Counsel's Dig., Assem. Amend. to Sen. Bill No. 125 (1979-1980 Reg. Sess.) June 9, 1980; Legis. Counsel's Dig., Sen. Bill No. 125, 4 Stats. 1980 (Reg. Sess.) Summary Dig., p. 415.)

In a similar vein, defendants rely on the fact that seven years after the enactment of the EMS Act, the Legislature enacted the Fire Protection District Law of 1987, also known as the Bergeson Fire District Law. (See § 13800 et seq.) Section 13801 of that law states, "[t]he Legislature finds and declares that the local provision of fire protection services, rescue services, emergency medical services, hazardous material emergency response services, ambulance services, and other services relating to the protection of lives and property is critical to the public peace, health, and safety of the state. Among the ways that local communities have provided for those services has been the creation of fire protection districts. Local control over the types, levels, and availability of these services is a longstanding tradition in California which the Legislature intends to retain. Recognizing that the state's communities have diverse needs and resources, it is the intent of the Legislature in enacting this part to provide a broad statutory authority for local officials. The Legislature encourages local communities and their officials to adapt the powers and procedures in this part to meet their own circumstances and responsibilities."

Contrary to defendants' assertion, nothing in the Bergeson Fire District Law indicates that the Legislature intended to permit fire districts—whether they qualify as section 1797.201 providers or not—to operate outside of the emergency medical services systems of their local EMS agencies. In fact, another provision of that law expressly cross-references the EMS Act, authorizing fire districts to provide "[a]mbulance services, *pursuant to [the EMS Act]*." (See § 13862, subd. (e), italics added.) Like the Bergeson Fire District Law, the EMS Act expresses a preference for "local control." Chapter 4 of the EMS Act, entitled "Local Administration," simply places this local control under the auspices of local EMS agencies, ensuring section 1797.201 providers an ongoing role provided that they request and enter into written agreements.

Nor should we ascribe any particular significance to the fact that county participation under the EMS Act is voluntary. The voluntary nature of

county participation appears to reflect nothing more than a desire to avoid even the arguable risk that the statute might be deemed to have imposed an unfunded mandate. (See Cal. Const., art. XIII B, § 6.) The League of California Cities letter raised a similar concern vis-à-vis cities, noting that "to remove the ability to establish service levels according to community needs and the community's ability to pay for them would have the same effect as if the state were to mandate levels of service without providing adequate financial support."

## B.   *Coordinated and Integrated Chaos*

The Legislature designed a template to bring order to a dangerously fragmented, spotty, and unwieldy emergency medical services system. The Court of Appeal, more than a decade after the enactment of the EMS Act, decided to reinvent chaos. The majority, eager to prove it can thrive on chaos, validates the Court of Appeal's misconstruction and proceeds to offer its own legislative solution. There is a critical difference between the Legislature's effort and this court's foray into unauthorized lawmaking. The Legislature's scheme, if given a chance, would work. The majority's Rube Goldberg contraption never will.

Attempting to salvage what little remains of the EMS Act, the majority slaps "significant constraints" on the administrative control of section 1797.201 providers. (Maj. opn., *ante*, at p. 925.) For example, the majority concludes that a section 1797.201 provider is limited to those *types* of emergency medical services that it historically provided. (See maj. opn., *ante*, at pp. 929-934.) There are numerous problems with this approach.[2]

First, the express language of section 1797.201 allows a section 1797.201 provider to increase the "level" of services it provides, requiring only that "prehospital emergency medical services shall be continued *at not less than* the existing level." (See *ante*, at p. 941, fn. 1, italics added.) The language of section 1797.201 does not support the majority's proffered distinction between the "level" and the "type" of services provided. To the contrary, what is "retained" under section 1797.201 is the general right to "the administration of prehospital EMS," which, by its very definition, includes all different

---

[2]The majority's resolution of the medical control issue is equally problematic. (See maj. opn., *ante*, at pp. 925-929.) Even though the majority is unable to identify a single medical control standard established by the Authority that authorizes either of the two disputed protocols, it nonetheless upholds both of the protocols under the guise of medical control. Section 1798, subdivision (a), however, expressly requires that "medical control shall be maintained *in accordance with standards for medical control established by the [A]uthority*." (Italics added.) In my view, we need not redefine medical control in order to uphold the protocols. Rather, since the City has not requested a written agreement, it is subject to the administrative control of its local EMS agency, which includes the right to mandate compliance with the protocols.

"types" of services. (See § 1797.72 [defining " '[e]mergency medical services' " as "the services utilized in responding to a medical emergency"].) Thus, under the language of the statute, the right of a section 1797.201 provider to increase the existing "level" of its prehospital emergency medical services encompasses the right to initiate different "types" of services. (See *City of Petaluma* v. *County of Sonoma, supra*, 12 Cal.App.4th at p. 1245 [The word " 'level' " in section 1797.201 "obviously refers to such matters as the quantity of available staff, vehicles, equipment, etc., and/or to the type and character of available EMS services as constituting basic, advanced, or limited advanced life support (see §§ 1797.60, 1797.52, 1797.92).")].)

Second, the legislative history of section 1797.201 confirms that it was not intended to limit a section 1797.201 provider to a particular "type" of prehospital emergency medical services. Before enacting section 1797.201, the Legislature amended an earlier version of the bill, which would have required that "[u]ntil such time that an agreement is reached *the existing level and manner* of prehospital emergency medical services *shall be maintained*." (Sen. Bill No. 125 (1979-1980 Reg. Sess.) as amended June 17, 1980, italics added.) When it deleted the requirement that a section 1797.201 provider maintain the same "manner" of services, the Legislature declined to limit a section 1797.201 provider to a certain "domain," "scope," or "type[]" of services. (See, e.g., maj. opn., *ante*, at pp. 929, 931; see also Webster's Collegiate Dict. (10th ed. 1993) p. 708 [defining "manner" as "kind" or "sort"].)

Third, attempting to draw a distinction between the "level" and the "type" of prehospital emergency medical services will prove completely unworkable where it matters the most—in practice. This case provides a good illustration. Here, there is evidence that the City provided at least some ambulance transport services as of June 1, 1980. The majority does not articulate a satisfactory explanation as to why an expansion of these services constitutes a proscribed new "type" of service rather than a permissible increase in the "level" of service. Instead, to circumvent the evidence and to avoid a problem of its own creation, the majority simply invents a new "type" of prehospital emergency medical services—"specialized ambulance services" (maj. opn., *ante*, at p. 934, fn. 4)—a term found nowhere in the "comprehensive system" established by the 100-plus provisions of the EMS Act. (*Id.* at p. 915.)

Finally, under the regime of "concurrent jurisdiction" envisioned by the majority (maj. opn., *ante*, at p. 933), both section 1797.201 providers and county-designated providers are permitted to operate in the same jurisdiction on an ongoing basis and with no one in charge. Such a result is wholly

incompatible with the Legislature's express desire to coordinate and integrate all activities relating to prehospital emergency medical services. The majority turns a blind eye to the unfortunate consequences of its decision, consequences that are already playing themselves out in a number of jurisdictions. As one commentator recently observed, "[i]n large part, the EMS Authority has played the role of the U.N. in the 'balkanization' of EMS services in California. While the battles between the cities and counties rage, the Authority takes the moral high ground but does little to genuinely resolve the conflicts except to issue edicts and commands. Like the U.N., it has few resources to call its own and it is too politically compromised by its ties to the warring factions (the California Ambulance Association and the Fire Fighter's Association) to do anything that does not meet with the approval of both." (Toma, *Legal Impediments to Cost Effective Provision of Emergency Medical Services in California: Why Ambulance Franchising and Other Innovations to Control EMS Costs May Fail* (1995) 17 Whittier L.Rev. 47, 61, fn. 69.) This observation demonstrates why we should stick with the *real* legislative solution—the one crafted by our Legislature—which would send cities and counties from the battlefield to the bargaining table. (See *ante*, at pp. 941-948.)

## III. CONCLUSION

The language of section 1797.201, other provisions of the EMS Act, and the legislative intent apparent in the statute all demonstrate that a section 1797.201 provider must integrate its operations into the system of its local EMS agency. If a section 1797.201 provider desires input as to the terms of this integration, it must request a written agreement. In this case, the City has not requested such an agreement and, hence, is not entitled to any of the interim protections set forth in section 1797.201. I would reverse the contrary judgment of the Court of Appeal.