[No. H028864. Sixth Dist. Apr. 19, 2006.]

BRANCIFORTE HEIGHTS, LLC, Plaintiff and Respondent, v.
CITY OF SANTA CRUZ et al., Defendants and Appellants.

918

## COUNSEL

Atchison, Barisone, Condotti & Kovacevich, John G. Barisone and Jeffrey E. Barnes for Defendants and Appellants.

Bosso, Williams and Edward L. Chun for Plaintiff and Respondent.

## OPINION

**ELIA, Acting P. J.**—In this Subdivision Map Act (Map Act) (Gov. Code, § 66410 et seq.)[1] case, appellant City of Santa Cruz (City) challenges the superior court's issuance of a writ of mandate directing the City to allow a private open space credit against the park fees exacted from respondent Branciforte Heights, LLC (Branciforte), a limited liability company, the developer of the Branciforte Heights subdivision. Section 66477, which is also known as the Quimby Act (§ 66477, subd. (g)) and is part of the Map Act, generally authorizes local governments to require, by ordinance, park land dedication or in-lieu fees as a condition to the approval of a tentative or parcel map. (§ 66477, subd. (a).) Section 66477 contains a provision creating eligibility for a credit "for the value of private open space within the development which is usable for active recreational uses." (§ 66477, subd. (e).)

The central substantive question in this case is whether subdivision (e) of section 66477 imposed a duty on the City to provide a private open space credit against the park and recreation fees assessed against Branciforte. The City maintains that it retains discretion under subdivision (e) of section 66477 to decide whether to include a private open space credit in its park fee ordinance and the City may "eschew private open space credits in favor of a policy and ordinance intended to advance public parkland development." The City additionally claims that the open space amenity was provided "in consideration for the project's PUD permit," which authorized a development plan not permitted under conventional zoning and, therefore, the provision of

---

[1] All further statutory references are to the Government Code unless otherwise specified.

open space was not an aspect of subdivision permit approval against which such a credit could be applied. The City also asserts that respondent's petition was procedurally barred.

█ As we will discuss below, the City's procedural claims are not established by the appellate record. As to the substantive merits, we hold that subdivision (e) of section 66477 does not create the direct right to receive a private open space credit that is enforceable by a traditional writ of mandate under Code of Civil Procedure section 1085. Consequently, the trial court erred in issuing a writ compelling the City to allow a credit for private open space in the absence of a local ordinance providing for such a credit.

A. *Procedural History*

On June 16, 2004, Branciforte filed a petition for writ of mandamus and administrative mandamus and a complaint for declaratory relief. In its prayer for relief, Branciforte sought, among other things, a writ directing the City and the City's director of the planning department (Director) to issue a credit in "an amount equal to the value of the land held as open space useable for recreational purposes and the improvements made," which allegedly totaled at least $118,250.

By order filed on April 26, 2005, the superior court issued a writ of mandate "compelling the City of Santa Cruz to allow a credit against the park fees for the value, at the time the fee was imposed, of that portion of the private open space in the development that is suitable for active recreational use." A formal judgment with the identical language was filed on May 5, 2005. The City and its Director appealed.

B. *Administrative Record*

The owners of property located at 1430–1438 North Branciforte Avenue applied for a conceptual planned development permit to demolish four existing units and construct 10 single-family, two-story dwellings. By resolution adopted on September 7, 1999, following a public hearing to consider the permit, the Santa Cruz City Council made certain findings and approved a conceptual planned development permit subject to attached conditions of approval and to a reduction of the subdivision to nine units "to accommodate guest parking and a higher level of amenity of common open space."[2] One condition of approval required the tentative map and design

---

[2] The Santa Cruz Municipal Code establishes a planned development (PD) permitting process in addition to traditional zoning. (See Santa Cruz Mun. Code, tit. 24, §§ 24.09.700 et seq. [planned development permit], 24.10.010 et seq. [land use districts].) A planned development permit allows deviation from conventional zoning in a number of areas, including open

permit application to be submitted within six months. Another condition specified in part: "The property lines for the Tentative Map shall be reconfigured to provide a common area in the front yards adjacent to the street. The common area shall be landscaped and maintained by the Homeowners Association."

The owners of the property located at 1430–1438 North Branciforte Avenue applied for a tentative tract map, design permit, and demolition authorization to demolish the four existing units and construct nine single-family, two-story dwellings. By resolution adopted on October 24, 2000, following a public hearing, the city council approved "Permit 00-052 requesting approval of a Tentative Map, a Design Permit and Demolition Authorization" subject to numerous conditions of approval. Condition No. 2 included: "The final map of the subdivision shall be submitted showing compliance with all the provisions of Title 23 of the Santa Cruz Municipal Code, or with approved exceptions thereto." Condition No. 11 stated: "The specified common area shall be designated as a public utility easement."

By resolution adopted on July 22, 2003, the city council approved the Final Map for Tract No. 1435, the Branciforte Heights Subdivision, and authorized and directed the city manager to execute the Branciforte Heights subdivision agreement with Branciforte. The following day, the City and Branciforte entered a subdivision agreement regarding the performance of the work and agreeing, among other things, that Branciforte Heights would "pay all fees and taxes required by law."

In a letter dated September 11, 2003, to the City's chief building official, William Thurlow, on behalf of Branciforte asserted: "As per 23.28.020.1 of the Santa Cruz Municipal Code, the Branciforte Heights subdivision is dedicating usable open space for the purpose of providing park and recreational facilities to serve the subdivision. In doing so, the subdivision is not required to pay Park and Recreation 'in lieu' fees."

Section 23.28.020.1 of title 23 of the Santa Cruz Municipal Code requires a subdivider to dedicate land and/or pay in-lieu fees as a condition of approval.[3] Title 23 contains no provision for a private open space credit.

---

space requirements and lot area. (See Santa Cruz Mun. Code, tit. 24, §§ 24.08.700, 24.08.720.) The planned development process is intended to allow innovation and creative site planning that benefit the public as well as developers. (See Santa Cruz Mun. Code, tit. 24, § 24.08.710.) Before a planned development permit is approved, the code requires a finding that "[o]verall, the amenity level of the development and *the amount of open space shall be greater* than what would have been permitted by the underlying district regulations." (Santa Cruz Mun. Code, tit. 24, § 24.08.770, italics added.)

[3] Section 23.28.020.1 of title 23 of the Santa Cruz Municipal Code provides: "As a condition of approval of a final subdivision map or parcel map, the subdivider shall dedicate

In a letter dated December 16, 2003, to the Director, Thurlow thanked the director and his staff for considering his request for a private open space credit and acknowledged that the request had been "denied based on Planning Staff's reading of the Park Dedication Ordinance (23.28.020.1) of the Santa Cruz Municipal Code." Thurlow asserted in his letter that the "Branciforte Heights subdivision as a planned development is eligible to receive a Park Dedication Fee Credit for the 4040 square foot common area provided on Parcel A."

Branciforte began to obtain building permits for various lots and pay the assessed park and recreation fees. On December 18, 2003, a $6,000 park and recreation fee was imposed and paid in connection with issuance of a building permit for 20 Camille Lane. On January 13, 2004, a $6,315 park and recreation fee was imposed and paid in connection with issuance of a building permit for 10 Camille Lane and a $6,315 park and recreation fee was imposed and paid in connection with issuance of a building permit for 30 Camille Lane. On January 21, 2004, a $1,011 park and recreation fee was imposed and paid in connection with issuance of a building permit for 35 Camille Lane and a $7,005 park and recreation fee was imposed and paid in connection with issuance of a building permit for 40 Camille Lane.

In a letter to Thurlow dated January 21, 2004, Director Eugene Arner responded to Branciforte's demand for a private open space credit. Director Arner stated that open space amenity was related to the approval of Branciforte's planned development, which permitted deviations from standard zoning. He explained that Branciforte had provided "4,040 square feet of common open space, within the development as well as a common landscape area along Branciforte Avenue" in exchange for certain variations and increased density. He noted that only six or possibly seven lots would otherwise have been allowed under standard requirements rather than the nine lots authorized in the planned development process. He concluded that "the

---

land, pay a fee in lieu thereof, or both, at the option of the city, for park or recreational purposes, at the time and according to the standards and formula contained in this title. The land, fees, or combinations thereof, are to be used only for the purpose of providing park or recreational facilities to serve the subdivision. Usable open space shall be composed of land that offers natural advantages for the type of facilities to serve the subdivision. Usable open space shall be composed of land that offers natural advantages for the type of facilities proposed to serve the area. Except in the case of condominium conversions, which shall be exempt from dedication requirements, the subdivider shall provide one of the following: [¶] (a) Dedication of all lands to be provided for usable open space. [¶] (b) The dedication of any portion of proposed usable open space lying within the boundaries of the subdivision, plus a fee to fulfill the requirements of this title as herein described. [¶] (c) A fee in lieu of such dedication shall be required, when no portion of the proposed usable open space is planned to be located within the limits of the subdivision. [¶] (d) Only the payment of a fee may be required in the case of a subdivision of fifty or fewer parcels. [¶] (e) The reservation of permanently maintained private usable open spaces which meet the requirements of this title."

open space should not be credited towards the required park land dedication fees" because "otherwise, the Planned Development designation would basically be illusory as a means of obtaining a waiver of strict zoning criteria." Director Arner also stated that private open space credit would have been reflected in the conditions of approval if such credit had been contemplated.

In a letter to Director Arner dated February 12, 2004, a law firm representing Branciforte asserted that the City had erred in refusing to give an open space credit and the City was required to provide such credit. Director Arner stated in his responding letter, dated March 12, 2004, that it was the City's position that "State law does not mandate park fee credit . . . ." He explained: "The approval of a Planned Development is based on a higher level of amenity than would be required under a typical subdivision. The use of open space within the Branciforte Heights Planned Development is one of the amenities that allowed the project to be approved. In exchange for the higher level of amenity, the applicant received a higher density than what could have been approved under the R-1-5 lot standards." He also provided a legal memorandum from the city attorney.

The law firm representing Branciforte then corresponded directly with the city attorney in a letter dated April 2, 2004. The letter informed the City that Branciforte "intends to file suit if the City maintains its position on this [private open space credit] issue."

On April 7, 2004, a $6,315 park and recreation fee was imposed and paid in connection with issuance of a building permit for 60 Camille Lane and a $7,005 park and recreation fee was imposed and paid in connection with issuance of a building permit for 75 Camille Lane. The total park and recreation fee paid by Branciforte to obtain issuance of building permits was $39,966.

Branciforte thereafter commenced legal action.

## C. *Procedural Issues*

The City claims that the writ petition was procedurally barred on a number of grounds: expiration of the statute of limitations, failure to comply with the claim presentation requirement of California Tort Claims Act, and failure to exhaust administrative remedies.

### 1. *Statute of Limitations*

The City asserts that this action cannot be maintained under section 66499.37 of the Map Act and "the corresponding 90-day statute of limitation

prescribed by the City's Subdivision Ordinance." Section 66499.37 states in pertinent part: "Any action or proceeding to attack, review, set aside, void or annul the decision of an advisory agency, appeal board or legislative body concerning a subdivision, or of any of the proceedings, acts or determinations taken, done or made prior to such decision, or to determine the reasonableness, legality or validity of any condition attached thereto, shall not be maintained by any person unless such action or proceeding is commenced and service of summons effected within 90 days after the date of such decision. Thereafter all persons are barred from any such action or proceeding or any defense of invalidity or unreasonableness of such decision or of such proceedings, acts or determinations." Santa Cruz Municipal Code, title 23, section 23.36.060 contains substantially the same language: "Any action or proceeding to attach [*sic*], review, set aside, void or annul the decision of the zoning administrator, zoning board or city council concerning a subdivision, or of any proceedings, acts or determinations taken, done or made prior to such decision, or to determine the reasonableness, legality or validity of any condition attached thereto, shall not be maintained by any person unless the action or proceeding is commenced and service of summons effected within ninety days after the date of the decision. Thereafter all persons are barred from any such action or proceeding or any defense of invalidity or unreasonableness of the decision or of the proceedings, acts or determinations."

Branciforte counters that section 66020, a provision of the Mitigation Fee Act (see § 66000.5), governs the time for commencing this action rather than section 66499.37 or the corresponding municipal ordinance. It invokes the special-over-the-general rule of statutory construction. "It is a settled rule of statutory construction that a special statute dealing expressly with a particular subject controls and takes priority over a general statute. (See, e.g., *Brill* v. *County of Los Angeles* (1940) 16 Cal.2d 726, 736 [108 P.2d 443].)" (*Lacy v. Richmond Unified Sch. Dist.* (1975) 13 Cal.3d 469, 472 [119 Cal.Rptr. 1, 530 P.2d 1377].) The City maintains that the Mitigation Fee Act does not apply.

█ Section 66020, subdivision (a), authorizes "any party" to "protest the imposition of any fees, dedications, reservations, or other exactions imposed on a development project, as defined in Section 66000, by a local agency . . . ." " 'Development project' means any project undertaken for the purpose of development. 'Development project' includes a project involving the issuance of a permit for construction or reconstruction, but not a permit to operate." (§ 66000, subd. (a).)

A party protesting a fee is required to serve a "*written notice* on the *governing body* of the entity" that contains "[a] statement that the required payment is tendered or will be tendered when due . . . *under protest*" and a

statement of facts and legal theory supporting its protest. (§ 66020, subd. (a), italics added.) Section 66021 makes the protest procedures provided by section 66020 available to "[a]ny party on whom a fee, tax, assessment, dedication, reservation, or other exaction has been imposed, the payment or performance of which is required to obtain governmental approval of a development, as defined by Section 65927, or development project."[4]

■ A protest filed under section 66020, subdivision (a), must "be filed at the time of approval or conditional approval of the development or within 90 days after the date of the imposition of the fees, dedications, reservations, or other exactions to be imposed on a development project." (§ 66020, subd. (d)(1).) Section 66020 requires each local agency to "provide to the project applicant a notice in writing at the time of the approval of the project or at the time of the imposition of the fees, dedications, reservations, or other exactions, a statement of the amount of the fees or a description of the dedications, reservations, or other exactions, and notification that the 90-day approval period in which the applicant may protest has begun." (*Ibid.*)[5] "The imposition of fees, dedications, reservations, or other exactions occurs, for the purposes of this section, when they are imposed or levied on a specific development." (§ 66020, subd. (h).)

■ "Any party *who files a protest pursuant to subdivision (a)* may file an action to attack, review, set aside, void, or annul the imposition of the fees, dedications, reservations, or other exactions imposed on a development project by a local agency *within 180 days after the delivery of the notice.*" (§ 66020, subd. (d)(2), italics added.) Thus, the 180-day limitations period under section 66020 does not commence running until written notice of the 90-day protest period has been delivered to a party complying with the protest provisions.[6]

Section 66023, subdivision (e), states: "The Legislature finds and declares that oversight of local agency fees is a matter of statewide interest and

---

[4] "Development" as defined by section 65927 includes "the placement or erection of any solid material or structure," and "change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act (commencing with Section 66410 of the Government Code), and any other division of land except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use . . . ."

[5] "Local agency" as used in section 66020 includes "a . . . city, whether general law or chartered." (§§ 66000, subd. (c), 66025.)

[6] Of course, if the 180-day statute of limitation does not begin to run because a local agency fails to deliver such notice, the affirmative defense of laches might be a bar. In this case, the City asserted the affirmative defense of laches in its answer but did not argue laches in its written opposition to Branciforte's petition.

concern. It is, therefore, the intent of the Legislature that this chapter [which includes section 66020] shall supersede all conflicting local laws and shall apply in charter cities."

■ The question before us is whether the statute of limitations provided by the Subdivision Map Act (§ 66499.37) or the Mitigation Fee Act (§ 66020) applies to this mandate action. "The statute of limitations applicable to a writ of mandamus under Code of Civil Procedure section 1085 depends upon the nature of the obligation sought to be enforced. (*Green* v. *Obledo* (1981) 29 Cal.3d 126, 141, fn. 10 [172 Cal.Rptr. 206, 624 P.2d 256].)" (*Ragan v. City of Hawthorne* (1989) 212 Cal.App.3d 1361, 1367 [261 Cal.Rptr. 219].) "It is often difficult to decide which statute of limitations governs an action for writ of mandate. The code provisions authorizing this action are silent as to the time within which it must be filed. (See Code Civ. Proc., § 1085 et seq.) Accordingly, the courts have developed the rule that the question is to be resolved not by the remedy prayed for but by the nature of the underlying right or obligation that the action seeks to enforce. (*Allen* v. *Humboldt County Board of Supervisors* (1963) 220 Cal.App.2d 877, 884 [34 Cal.Rptr. 232].)" (*Green v. Obledo, supra*, 29 Cal.3d at p. 141, fn. 10.)

■ This approach is not particularly helpful here since the underlying right claimed by Branciforte was the right to a credit against the park and recreation fees imposed as a condition of subdivision approval. In our view, there is argument supporting application of both statutes of limitations and, therefore, an ambiguity exists. "To resolve ambiguities, courts may employ a variety of extrinsic construction aids, including legislative history, and will adopt the construction that best harmonizes the statute both internally and with related statutes. (*Pacific Gas & Electric Co. v. County of Stanislaus* (1997) 16 Cal.4th 1143, 1152 [69 Cal.Rptr.2d 329, 947 P.2d 291]; *Hsu v. Abbara* (1995) 9 Cal.4th 863, 871 [39 Cal.Rptr.2d 824, 891 P.2d 804] . . . .)" (*Summers v. Newman* (1999) 20 Cal.4th 1021, 1026 [86 Cal.Rptr.2d 303, 978 P.2d 1225].) "Statutes for the same subject, although in apparent conflict, are construed to be in harmony if reasonably possible." (2B Singer, Sutherland Statutory Construction (6th ed. 2000) p. 191; see *People v. Acosta* (2002) 29 Cal.4th 105, 134 [124 Cal.Rptr.2d 435, 52 P.3d 624]; *County of San Bernardino v. City of San Bernardino* (1997) 15 Cal.4th 909, 933 [64 Cal.Rptr.2d 814, 938 P.2d 876] ["Our duty is to harmonize statutes wherever possible"].)

Looking at the legislative history, we note that the Mitigation Fee Act, which includes sections 66020 and 66021, was added in 1990 as part of a bill intended to consolidate "various limitations and procedural requirements applicable to the imposition by local government agencies of fees and exactions on real property and development." (Legis. Counsel's Dig., Assem.

Bill No. 3228 (1989–1990 Reg. Sess.) Summary Dig., p. 642.) Section 66021, as originally enacted, provided in part: "If a party files a protest under both Sections 66020 and 66475.4, Section 66475.4 shall prevail over Section 66020 to the extent of any conflict between those two sections." (Stats. 1990, ch. 1572, § 22, p. 7504.)

Former section 66475.4 concerned excessive dedication requirements and was a provision of the Map Act added in 1984 (Stats. 1984, ch. 1722, § 1, pp. 6249–6250; see § 66410). "Dedication" basically referred to a transfer of an interest in real property as opposed to a monetary exaction.[7] Former section 66475.4 provided that "[a] dedication requirement claimed to be excessive in whole or in part, which is imposed as a condition of approval of a tentative map, may be reviewed by a writ of administrative mandate pursuant to Section 1094.5 of the Code of Civil Procedure." (Stats. 1984, ch. 1722, § 1, p. 6250.) Former section 66475.4 specified: "The petition for the writ shall be filed within the time prescribed by Section 66499.37." (Stats. 1984, ch. 1722, § 1, p. 6250.) This statutory requirement was consistent with earlier case law. (See *Timberidge Enterprises, Inc. v. City of Santa Rosa* (1978) 86 Cal.App.3d 873, 877, 886 [150 Cal.Rptr. 606].)

Section 66020 was derived from former section 65913.5, which was also enacted in 1984 (Stats. 1984, ch. 653, § 1, pp. 2411–2412). The corresponding Legislative Counsel's Digest stated: "Existing law does not contain a procedure allowing a party to protest the imposition of any fees, taxes, assessments, dedications, reservations, or other exactions on residential housing developments by local governmental entities. [¶] This bill would permit any party to protest the imposition of those exactions in accordance with a specified procedure; [and] would permit any party who so protests to file an action to attack, review, set aside, void or annul those impositions . . . ." (Legis. Counsel's Dig., Sen. Bill No. 2136 (1983–1984 Reg. Sess.) Summary Dig., p. 222.)

Former section 66475.4 was repealed, operative January 1, 1996, by its own terms. (Stats. 1987, ch. 803, § 2, p. 2513.) In *Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854 [50 Cal.Rptr.2d 242, 911 P.2d 429], the California Supreme Court observed that the "broadly formulated and unqualified authorization" of section 66021 was "consistent with the view that the Legislature intended to require *all* protests to a development fee that challenge the sufficiency of its relationship to the effects attributable to a development

---

[7] "Dedication" was defined to mean "a transfer by a subdivider to a city, county, or city and county of title to real property or any interest therein, or of an easement or right in real property, the transfer of facilities, or the installation of improvements as defined in Section 66419, or any combination thereof." (Stats. 1984, ch. 1722, § 1, p. 6249.)

project—regardless of the legal underpinnings of the protest—to be channeled through the administrative procedures mandated by the [Mitigation Fee] Act." (12 Cal.4th at p. 866.)

In 1998, section 66021 was amended to delete references to former section 66475.4. (Stats. 1998, ch. 689, § 7.) The legislative history of the 1998 amendment of section 66021 suggests the Legislature's understanding was that the Mitigation Fee Act generally governed developer's protests against fees imposed upon developments. A Senate analysis stated: "The Mitigation Fee Act governs the imposition of local developer fees and contains the procedures for protesting and challenging unfair fees (Government Code Section 66020). Before it passed the Mitigation Fee Act in 1990, the Legislature had already created a procedure in the Subdivision Map Act for challenging subdivision fees. The Map Act procedure 'sunsetted' on January 1, 1996 (former Government Code Section 66475.4; sunset date set by AB 450, Costa, 1987). Legal observers note that the Mitigation Fee Act still allows a developer to protest under both its own provisions and the now-obsolete Map Act provision (Government Code Section 66021 [a]). To avoid confusion, they want the Legislature to delete the obsolete cross-reference to the former provision in the Map Act . . . . [¶] This bill deletes the obsolete statutory cross-reference."[8] (Sen. Rules Com., Off. of Sen. Floor Analyses, Sen. Bill No. 1362 (1997–1998 Reg. Sess.) as amended Aug. 6, 1998; see Sen. Rules Com., Off. of Sen. Floor Analyses, Sen. Bill No. 1362 (1997–1998 Reg. Sess.) as amended July 8, 1998; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1362 (1997–1998 Reg. Sess.) as amended Feb. 18, 1998.)

■ Based upon our review of legislative history, we conclude that where a party properly avails itself of the fee protest procedures of section 66020 to challenge allegedly excessive fees imposed upon a development project or as a condition of obtaining governmental approval of a development or development project (see §§ 66020, 66021), the limitations period is the one established by section 66020. Contrariwise, where a party does not comply with the fee protest procedures of section 66020 to challenge Quimby Act ordinance fees imposed as a condition to the approval of a tentative map or parcel map (see § 66477), a traditional mandate action must be brought within the time specified by section 66499.37, the statute of limitations generally applicable to subdivision decisions. This construction both harmonizes potentially conflicting statutes and effectuates the legislative intent to create a unified system for protesting fees and other exactions imposed upon developments or development projects.

---

[8] Although the legislative analyses indicated that former section 66475.4 applied to subdivision fees, the section actually applied to only excessive dedications.

As to this appeal, the City makes no argument, and provides no citations to the appellate record, showing that Branciforte did not comply with the protest procedures set forth in section 66020 or that the City provided a written notice in accordance with section 66020, subdivision (d)(1), commencing the 180-day limitation period. In fact, the City states in its brief: "In order to obtain the building permits from the City necessary to undertake construction, Branciforte subsequently paid the City the full $39,966 in park fees 'under protest.' " Accordingly, we are unable to conclude on the limited record before us that the 180-day limitation period provided by section 66020 either was inapplicable or had expired before this action was filed.

### 2. *California Tort Claims Act*

The City claims that the writ petition was procedurally barred because Branciforte did not comply with claim presentation requirements imposed by the California Tort Claims Act. (See §§ 905, 945.5.) Respondent Branciforte maintains that the California Tort Claims Act does not apply and this action is authorized because it followed the protest procedure provided by section 66020. Branciforte further contends that, if the Tort Claims Act required presentation of a claim, its December 16, 2003 letter to the Director satisfied the claim requirement as did its attorney's subsequent demand letters.

■ The Tort Claims Act prescribes a claim presentation requirement for "all claims for money or damages against local public entities" (§ 905) and generally bars lawsuits for money or damages against such public entities unless a written claim has been timely presented and acted upon or deemed to have been rejected (§ 945.4). But case law suggests that, even though the payment of money may be involved, an action to compel the return of a specific sum of money belonging to a party under applicable law is not a claim "for money or damages."

■ In *Minsky v. City of Los Angeles* (1974) 11 Cal.3d 113 [113 Cal.Rptr. 102, 520 P.2d 726], which involved the demurrer to "an action by an arrestee for the return of property taken by local police officers at the time of arrest and wrongfully withheld following the disposition of criminal charges," the Supreme Court considered whether an action to recover $7,720 allegedly taken by police was a claim for money or damages within the meaning of the Tort Claims Act. (11 Cal.3d at pp. 116–117.) The court recognized the general rule that the Act does not apply to nonpecuniary actions, such as those seeking injunctive, specific or declaratory relief. (*Id.* at p. 121.) It also noted: "No court has intimated or held that the claims statute applies to the arrestee directly seeking mandamus in a criminal proceeding to compel the return of property wrongfully in the possession of custodial officers." (*Id.* at p. 123.)

The court in *Minsky* reasoned: "[T]he government in effect occupies the position of a bailee when it seizes from an arrestee property that is not shown to be contraband. [Citation.] The arrestee retains his right to eventual specific recovery, whether he seeks to regain tangible property like an automobile, ring, wallet or camera, or whether he seeks to recover a specific sum of money which, under general constructive trust principles, is traceable to property within the possession of the defendant. [Citations.]" (*Minsky v. City of Los Angeles, supra,* 11 Cal.3d at p. 121, fn. omitted.) It concluded that "the purposes of the claims statutes indicate that they do not apply to cases in which an owner seeks the return of private property held as bailee by the government and wrongfully retained." (*Id.* at p. 123.) The Supreme Court held that the action did not involve a claim for money or damages within the meaning of section 905. (11 Cal.3d at p. 124, fn. omitted.)

Subsequently, in *Holt v. Kelly* (1978) 20 Cal.3d 560 [143 Cal.Rptr. 625, 574 P.2d 441], the Supreme Court held "that an arrestee who seeks in good faith to specifically recover property taken from him at the time of his arrest is exempt from the claim filing provisions of the Government Code, even though some or all of the property may have been dissipated and respondent may be compelled to respond in damages in lieu of property." (*Id.* at p. 565, fn. omitted.) The court rejected the contention that "since some or all of the property is now unavailable he is responsible only by means of a proper claim for money damages and not in mandamus." (*Id.* at p. 565, fn. 5.) The court stated: "This position is without merit, especially in light of the fact that any property now missing is the result of respondent's own misconduct. We have heretofore held that mandamus may be brought to start the chain of action designed to compel a ministerial duty by a public officer, even if the ultimate goal may be recovery of a sum of money. [Citations.] It is also clear that mandamus will lie where the recovery of money is merely ancillary to an underlying proceeding which seeks performance of a ministerial duty. [Citations.]" (*Ibid.*)

In *Forde v. Cory* (1977) 66 Cal.App.3d 434 [135 Cal.Rptr. 903], an executor of a will brought a mandate action against the state controller attempting to compel payment of a lump sum death benefit from the Judges' Retirement Fund to the survivors of a deceased superior court judge. (*Id.* at p. 436.) The appellate court rejected the contention that failure to file a claim barred the action: "This mandamus suit would compel a state officer to perform an express statutory duty; it is not a money action against the state and is outside the purview of the claims statute. [Citation.]" (*Id.* at pp. 437–438.)

In *County of Sacramento v. Lackner* (1979) 97 Cal.App.3d 576 [159 Cal.Rptr. 1], a writ of mandate and declaratory relief action, plaintiff counties "sought to compel the state to disburse funds in the manner provided by the Medi-Cal

statutes." (*Id.* at p. 588.) Defendants argued, inter alia, that failure to comply with the claim procedures of the Tort Claims Act barred the action. (97 Cal.App.3d at pp. 586–587.) The appellate court rejected the argument, stating: "While the action has the practical effect of awarding plaintiffs money (which has routinely been referred to as 'damages' by all parties), in law it is simply an action in mandamus to compel by ministerial act the release of funds, not one for damages from the sovereign." (*Id.* at p. 588.)

The lone case cited by the City to support its contention that the claim presentation requirement of the Tort Claims Act applies in this case is *Madera Community Hospital v. County of Madera* (1984) 155 Cal.App.3d 136 [201 Cal.Rptr. 768]. In *Madera*, a community hospital filed a petition for a writ of mandate, a writ of certiorari and declaratory relief against Madera County, the board of supervisors, and the individual board members "primarily to compel County to adopt standards for the medical aid and care of the indigent and poor within Madera County as required by sections 17000 and 17001 of the Welfare and Institutions Code." (*Id.* at p. 139.) The appellate court concluded that "the failure to file a claim does not bar Hospital from seeking the writ of mandate to compel County to comply with the duty imposed on it by Welfare and Institutions Code sections 17000 and 17001." (*Id.* at p. 148.) But the court determined that "Hospital's failure to file a claim was fatal as to any monetary reimbursement sought by Hospital in this action . . . ." (*Id.* at pp. 148–149.) The court found *Lackner* distinguishable because the hospital had "failed to show any entitlement to reimbursement because of the absence of standards adopted by County which would authorize such payment." (*Id.* at p. 149.) Thus, *Madera* unsurprisingly indicates that a request for reimbursement may be a claim for money where there is no official duty to pay that is specifically enforceable.

■ Of course, an action's label is not determinative and an action seeking recovery of money may be subject to the Tort Claims Act, regardless whether it is denominated a mandamus petition. (See *Loehr v. Ventura County Community College Dist.* (1983) 147 Cal.App.3d 1071, 1080–1081 [195 Cal.Rptr. 576].) In *Loehr*, "[e]ach of the six causes of action [were] aimed at recovering monetary damages for acts and omissions allegedly committed by the individual defendants during the course and scope of their employment with the [Community College] District." (*Id.* at p. 1080.) The appellate court rejected the plaintiff's argument that his "self-styled causes of action for mandamus and injunctive relief" came within the "general rule that the claims statutes do not impose any requirements for nonpecuniary actions, such as those seeking injunctive, specific or declaratory relief" because plaintiff's demand for extraordinary relief was "merely incidental or ancillary to a prayer for damages. (Cf. *Baiza v. Southgate Recreation & Park Dist.* (1976) 59 Cal.App.3d 669 [130 Cal.Rptr. 836].)" (*Id.* at p. 1081.)

Here, Branciforte sought to enforce what it asserts is an express statutory duty to provide a private open space credit. If its claim is correct, this action comes within the ambit of those actions seeking to enforce performance of an official duty to return or pay money and it is not subject to the claim presentation requirements prescribed by the Tort Claims Act.

### 3. *Exhaustion of Administrative Remedies*

The City invokes the general doctrine of exhaustion of administrative remedies. It asserts that Branciforte should have used the administrative procedure provided by sections 23.32.010 and 23.32.010.1 of title 23 of its municipal code to seek a private open space credit. Those sections allow a subdivider to request modification to the provisions of title 23, the City's Subdivision Ordinance (See Santa Cruz Mun. Code, tit. 23, § 23.04.010).

Section 23.32.010 of title 23 of the Santa Cruz Municipal Code provides: "Upon the recommendations of the zoning board, the city council may permit modifications to the provisions of this title when one or more of the following conditions exists, or where, in their opinion, the particular provisions do not apply. Such modifications, if granted, shall conform to the spirit and purpose of the Map Act and of this title. [¶] (1) The land to be subdivided is unusual in size, shape, location, topography, or soil conditions. [¶] (2) The land to be subdivided is subject to unusual title limitations of record. [¶] (3) The land to be subdivided is to be devoted to a special use not covered herein. [¶] (4) Such modifications are necessary to ensure compliance with any applicable specific or area plans. [¶] (5) Such modifications are approved in conjunction with a planned development or a cluster development." Section 23.32.010.1 of title 23 of the Santa Cruz Municipal Code states: "When one or more of the foregoing conditions exists, the subdivider may submit a letter to the director of planning describing in detail the requested modifications to the provisions of this title. The director shall refer the request to the department involved, for recommendations. The zoning board shall review all such recommendations, including those of the planning department, prior to acting on any modification."

 " '[E]xhaustion of administrative remedies' " "refers to the requirement that administrative remedies be pursued as a jurisdictional prerequisite to seeking judicial relief from an administrative action." (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th at 1133, 1148 [43 Cal.Rptr.2d 693, 899 P.2d 79].) "In general, a party must exhaust administrative remedies before resorting to the courts. (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 292 [109 P.2d 942]; see *California Correctional Peace Officers Assn. v. State Personnel Bd.*[, *supra,*] 10 Cal.4th [at p.] 1148 . . . .) Under this rule, an administrative remedy is

exhausted only upon 'termination of all available, nonduplicative administrative review procedures.' [Citations.] [¶] 'The exhaustion doctrine is principally grounded on concerns favoring administrative autonomy (i.e., courts should not interfere with an agency determination until the agency has reached a final decision) and judicial efficiency (i.e., overworked courts should decline to intervene in an administrative dispute unless absolutely necessary).' [Citations.]" (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1080 [29 Cal.Rptr.3d 234, 112 P.3d 623].)

The provisions of the municipal code cited by the City simply do not provide a procedural mechanism for obtaining administrative review of Director Arner's rejection of Branciforte's request for a private open space credit in order to correct alleged error. The provisions cited by the City merely allow a subdivider to seek a modification of the requirements of the subdivision ordinance under limited circumstances. The City does not identify any one of the special conditions enumerated in section 23.32.010 of title 23 of the Santa Cruz Municipal Code that would have qualified Branciforte to request modification and, in any event, creation of an entirely new private open space credit would be much more than a minor adjustment to the City's subdivision ordinance. We reject the City's claim that Branciforte's failure to pursue relief under sections 23.32.010 and 23.32.010.1 of title 23 of the Santa Cruz Municipal Code constitutes a failure to exhaust administrative remedies which bars judicial relief.[9]

D. *Enforcement of the Private Open Space Credit*

1. *Traditional Mandate*

The only relief obtained in the court below was issuance of a writ of mandate compelling the City to allow a private open space credit. Since issuance of the writ turned on the interpretation of a statute, which is a question of law (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856]), and the facts were undisputed, we engage in de novo review. (See *Pomona Police Officers' Assn. v. City of Pomona* (1997) 58 Cal.App.4th 578, 584 [68 Cal.Rptr.2d 205]; *Los Angeles Lincoln Place Investors, Ltd. v. City of Los Angeles* (1997) 54 Cal.App.4th 53, 59 [62 Cal.Rptr.2d 600].)

A writ of mandate "may be issued by any court . . . to compel the performance of an act which the law specially enjoins, as a duty resulting

---

[9] We do not address whether failure to comply with the statutory fee protest procedures (§ 66020 et seq.) would constitute failure to exhaust administrative remedies since this issue has not been raised.

from an office, trust, or station . . . ." (Code Civ. Proc., § 1085, subd. (a).) To obtain writ relief, a petitioner must show " '(1) A clear, present and usually ministerial duty on the part of the respondent . . . ; and (2) a clear, present and beneficial right in the petitioner to the performance of that duty. . . .' (*Baldwin-Lima-Hamilton Corp. v. Superior Court* (1962) 208 Cal.App.2d 803, 813–814 [25 Cal.Rptr. 798], citations omitted.)" (*Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 539–540 [28 Cal.Rptr.2d 617, 869 P.2d 1142].) " 'A ministerial act is an act that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists.' (*Rodriguez v. Solis* (1991) 1 Cal.App.4th 495, 501 [2 Cal.Rptr.2d 50].)" (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916 [129 Cal.Rptr.2d 811, 62 P.3d 54].) The petitioner bears the burden of proof. (See *California Correctional Peace Officers Assn. v. State Personnel Bd., supra,* 10 Cal.4th at p. 1154.)

### 2. *Private Open Space Credit*

Branciforte successfully argued below that the City of Santa Cruz was duty-bound under section 66477, subdivision (e), to provide a private open space credit against the fees imposed for park and recreational purposes. Branciforte did not claim below, and is not claiming now, that any condition attached to the tentative map or final map approved by the City was invalid or unreasonable. None of the conditions attached to either subdivision map expressly precluded or denied credit for private open space within the development. As indicated above, specific park and recreation fees were imposed at the time of issuance of building permits on December 18, 2003, January 13, 2004, January 21, 2004, and April 7, 2004. The parties agree that no credit was given at any point for private open space within the development. The substantive issue before us is whether the City had a statutory duty to provide a private open space credit to Branciforte pursuant to subdivision (e) of section 66477.

 "In statutory construction cases, our fundamental task is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) We begin by examining the statutory language, giving the words their usual and ordinary meaning. (*Ibid.*; *People v. Lawrence* (2000) 24 Cal.4th 219, 230 [99 Cal.Rptr.2d 570, 6 P.3d 228].) If the terms of the statute are unambiguous, we presume the lawmakers meant what they said, and the plain meaning of the language governs. (*Day v. City of Fontana, supra,* 25 Cal.4th at p. 272; *People v. Lawrence, supra,* 24 Cal.4th at pp. 230–231.)" (*In re Angelique C.* (2003) 113 Cal.App.4th 509, 517 [6 Cal.Rptr.3d 395].)

██ Section 66477 authorizes a city or a county, by ordinance, to require subdividers to dedicate lands for park or recreational purposes, or to pay fees in lieu of dedication, as a condition to the approval of a tentative or parcel map "if all of the [specified] requirements are met . . . ." (§ 66477, subd. (a).) Those specific requirements are set forth in subdivision (a)(1) through (9) of section 66477.

The provision of a credit for park and recreational improvements to dedicated land, which is a credit distinct from credit for private open space at issue here, is one of those criteria. (See § 66477, subd. (a)(9).) The full text of subdivision (a)(9) of section 66477 reads: "If the subdivider provides park and recreational improvements to the dedicated land, the value of the improvements together with any equipment located thereon *shall be a credit* against the payment of fees or dedication of land required by the ordinance." (Italics added.)

Subdivision (e) of section 66477 recognizes a separate credit for private open space. Subdivision (e) is not one of the specified conditions circumscribing a municipality's dedication authority under section 66477, subdivision (a). Subdivision (e) also uses less commanding language than does subdivision (a)(9). It provides: "Common interest developments, as defined in Section 1351 of the Civil Code, *shall be eligible* to receive a credit, *as determined by the legislative body*, against the amount of land required to be dedicated, or the amount of the fee imposed, pursuant to this section, for the value of private open space within the development which is usable for active recreational uses."[10] (§ 66477, subd. (e), italics added.)

██ "Eligible" can mean "[f]it and proper to be selected or to receive a benefit" (Black's Law Dict., (8th ed. 1999) p. 559) or "qualified . . . to be chosen" (American Heritage Dict. (3d college ed. 1997) p. 446; Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 374). Thus, eligibility may mean something short of an entitlement, which is defined as "[a]n absolute right to a (usu. monetary) benefit . . . granted immediately upon meeting a legal requirement." (Black's Law Dict., *supra*, p. 573.) On the other hand, "eligible" can also mean "entitled to be chosen" (American Heritage Dict., *supra*, p. 446) or "entitled." (Merriam-Webster's Collegiate Dict., *supra*, p. 374). When we consider section 66477, subdivision (e) in the context

---

[10] Civil Code section 1351 defines "common interest development" to mean "any of the following: [¶] (1) A community apartment project. [¶] (2) A condominium project. [¶] (3) A planned development. [¶] (4) A stock cooperative." "Common area" is defined as "the entire common interest development except the separate interests therein." When enacted in 1982, the paragraph regarding private open space credit read: "Planned developments and real estate developments, as defined in Sections 11003 and 11003.1, respectively, of the Business and Professions Code, shall be eligible to receive a credit, as determined by the legislative body . . . ." (Stats. 1982, ch. 1467, § 1, p. 5657.)

of the statutory framework as a whole, as we must (see *Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563]), and juxtapose it with the improvements credit, it appears that the Legislature did not necessarily intend a private open space credit to be an absolute right. On the other hand, the word "shall" was used ("shall be eligible"), which typically denotes a mandatory requirement. (See § 14 [" 'Shall' is mandatory and 'may' is permissive"]; see also § 5 [construction of Government Code follows statutory definitions unless context requires otherwise].)

■ The words of a statute are generally "the most reliable indicator of legislative intent" (*Palmer v. GTE California, Inc.* (2003) 30 Cal.4th 1265, 1271 [135 Cal.Rptr.2d 654, 70 P.3d 1067]) but, in this case, we find the "shall be entitled" language of section 66477, subdivision (e) to be ambiguous. "A statute is regarded as ambiguous if it is capable of two constructions, both of which are reasonable. [Citations.]" (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 776 [72 Cal.Rptr.2d 624, 952 P.2d 641].)

■ "When the plain meaning of the statutory text is insufficient to resolve the question of its interpretation, the courts may turn to rules or maxims of construction 'which serve as aids in the sense that they express familiar insights about conventional language usage.' (2A Singer, Statutes and Statutory Construction (6th ed. 2000) p. 107.) Courts also look to the legislative history of the enactment. 'Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent.' (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)" (*Mejia v. Reed* (2003) 31 Cal.4th 657, 663 [3 Cal.Rptr.3d 390, 74 P.3d 166].)

■ Both credit provisions, the credit for park and recreational improvements to dedicated land and the credit for private open space, were added by the same statute in 1982. (Stats. 1982, ch. 1467, § 1, p. 5657.) It is a fundamental principle of statutory construction that "[w]here different words or phrases are used in the same connection in different parts of a statute, it is presumed the Legislature intended a different meaning. (*Playboy Enterprises, Inc. v. Superior Court* (1984) 154 Cal.App.3d 14, 21 [201 Cal.Rptr. 207].)" (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1117 [81 Cal.Rptr.2d 471, 969 P.2d 564].) We presume, therefore, that the Legislature intended different meanings when it couched the private open space credit in terms of eligibility "as determined by the legislative body" (Stats. 1982, ch. 1467, § 1, p. 5657) rather than declaring that there "shall be a credit" as it did in regard to the improvements credit (*ibid.*).

As clearly recognized in the legislative history of Senate Bill No. 1785 (1981–1982 Reg. Sess.) that amended section 66477, section 66477 previously did not permit a developer to be credited for the value of private open space within a development. (See Sen. Com. on Local Government, Analysis of Sen. Bill No. 1785 (1981–1982 Reg. Sess.) ["At this time, planned unit developments cannot, under the terms of the Quimby Act, receive credit for the value of private open space within the development"]; Sen. Republican Caucus, analysis of Sen. Bill No. 1785, as amended Aug. 24, 1982 [same].) Unfortunately, the legislative history offers inconsistent views as to whether passage of the bill would merely *allow* a private open space credit (Assem. Com. on Housing and Community Development, analysis of Sen. Bill No. 1785 (1981–1982 Reg. Sess.) as amended in Assembly Aug. 2, 1982; Minority Ways and Means Com., com. on Sen. Bill No. 1785 (1981–1982 Reg. Sess.) as amended Aug. 2, 1982; Cal. Dept. of Parks and Recreation, Enrolled Bill Rep. on Sen. Bill No. 1785 (1981–1982 Reg. Sess.) Sept. 1982; Cal. Dept. of Housing and Community Development, Enrolled Bill Rep. on Sen. Bill No. 1785 (1981–1982 Reg. Sess.) Sept. 13, 1982; Off. of Planning and Research, Enrolled Bill Rep. on Sen. Bill No. 1785 (1981–1982 Reg. Sess.) Sept. 15, 1982) or would affirmatively *establish* such a credit (Assem. Off. of Research, 3d reading analysis of Sen. Bill No. 1785 (1981–1982 Reg. Sess.) as amended Aug. 10, 1982; Legis. Analyst, analysis of Sen. Bill No. 1785 (1981–1982 Reg. Sess.) Aug. 10, 1982; Sen. Democratic Caucus, analysis of Sen. Bill No. 1785 (1981–1982 Reg. Sess.) as amended Aug. 24, 1982; Assem. Off. of Research, rev. 3d reading analysis of Sen. Bill No. 1785 (1981–1982 Reg. Sess.) as amended Aug. 24, 1982; Cal. Dept. of Finance, Enrolled Bill Rep. on Sen. Bill No. 1785 (1981–1982 Reg. Sess.) Sept. 10, 1982).

▮ The City asserts that section 66477, subdivision (e)'s phrase "as determined by the legislative body" "unambiguously affords local agencies the option, but not the mandate, to include a private open space credit provision in their park fee ordinances." We are aware that this phrase should not be disregarded since "[a]n interpretation that renders statutory language a nullity is obviously to be avoided. (See Code Civ. Proc., § 1858.)" (*Williams v. Superior Court* (1993) 5 Cal.4th 337, 357 [19 Cal.Rptr.2d 882, 852 P.2d 377].)

In his Senate floor statement on Senate Bill No. 1785, Senator Foran, the bill's author, explained the private open space credit aspect of the proposed legislation: "[It] [r]equires a credit against a required dedication for the value of private open space used for recreational purposes within a planned development. The residents of the planned development can use existing private facilities. The amount of the credit is determined by the legislative body." (Floor statement by Sen. John Francis Foran regarding Sen. Bill

No. 1785 (1981–1982 Reg. Sess.) May 21, 1982.) This statement suggests that, while some credit was anticipated, the precise amount of such credit was not prescribed by the bill.

In an effort to reach a proper construction of section 66477, subdivision (e) and effectuate legislative intent, we consider "the ostensible objects to be achieved, the evils to be remedied, . . . [and] public policy" (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 340 [14 Cal.Rptr.3d 857, 92 P.3d 350]) and the consequences that will flow from a given interpretation (see *Dyna-Med, Inc. v. Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1387). "A court should not adopt a statutory construction that will lead to results contrary to the Legislature's apparent purpose." (*Western Oil & Gas Assn. v. Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 425 [261 Cal.Rptr. 384, 777 P.2d 157].) "In the end, we ' "must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' [Citation.]" (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003 [111 Cal.Rptr.2d 564, 30 P.3d 57].)

The principal legislative purpose behind the 1982 changes to section 66477 apparently was to rein in excessive dedication and fee requirements imposed by local government as a condition of subdivision approval. (Cal. Dept. of Housing and Community Development, analysis of Sen. Bill No. 1785 (1981–1982 Reg. Sess.) May 20, 1982; Cal. Dept. of Housing and Community Development, Enrolled Bill Rep. on Sen. Bill No. 1785 (1981–1982 Reg. Sess.) Sept. 13, 1982; Off. of Planning and Research, Enrolled Bill Rep. on Sen. Bill No. 1785 (1981–1982 Reg. Sess.) Sept. 15, 1982.) Another objective was "to increase the amount of land available for home building." (Floor statement by Sen. John Francis Foran regarding Sen. Bill No. 1785 (1981–1982 Reg. Sess.) May 21, 1982; see Cal. Dept. of Housing and Community Development, Enrolled Bill Rep. on Sen. Bill No. 1785 (1981–1982 Reg. Sess.) Sept. 13, 1982 ["Excessive dedications and fees increase the per unit land cost for housing and reduce the potential number of units that could be built. [¶] . . . Due to the existence of high fees or dedication requirements, the need for legislation to reduce the impact of park land dedications on the cost of housing appears necessary"].) The Legislature's recognition of eligibility for a private open space credit in the Quimby Act provided another means by which cities and counties could reduce the cost of residential development.

While the California Legislature apparently envisioned that cities and counties would give some credit for usable private open space within a development, the Legislature did not go so far as to dictate the precise

parameters of any private open space credit or to define the meaning of "usable for active recreational uses." Instead, it left it up to local legislative bodies to determine the exact criteria and procedures for granting a credit consistent with statute. As subdivision (e) of section 66477 now reads, local legislatures retain the flexibility to implement a private open space credit as they determine reasonable under local conditions.

This construction comports with objectives sought to be achieved by the 1982 amendments to section 66477 and gives meaning to the phrase "as determined by the legislative body" (§ 66477, subd. (e)). It also avoids any potential preemption argument that might be raised against a local ordinance providing for a private open space credit to be given against the dedication or fee requirements imposed pursuant to section 66477. (Cf. *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 764 [29 Cal.Rptr.2d 804, 872 P.2d 143] [section of the Subdivision Map Act governing the merger of parcels "impliedly preempts zoning ordinances requiring, for issuance of a development permit, the merger of parcels that would not have been eligible subjects of merger under the standards of that section"].)

Our construction is reinforced by the recognition that, at the time of the 1982 amendments, the Legislature certainly knew how to restrict local dedication authority if it so desired. The 1982 amendments to section 66477, in addition to mandating a credit for park and recreational improvements to dedicated land, also strictly limited local authority to impose dedication and in-lieu fees based on specified residential density standards, confined the use of dedicated land or fees to the development of new or the rehabilitation of existing park or recreational facilities to serve the subdivision and thereby precluded fees from being used for operation and maintenance of such facilities, and excluded commercial subdivisions from the requirements of section 66477. (See Stats. 1982, ch. 1467, § 1, pp. 5655–5657.)

■ Unfortunately for Branciforte, the City has never adopted legislation providing a credit for private open space pursuant to section 66477. In the absence of such a municipal ordinance, the City has no clear, present and ministerial duty to provide Branciforte with a specific amount of credit for private open space and Branciforte has no clear, present, and beneficial right to performance of such a duty. Consequently, the court erred when it determined Branciforte was entitled to a writ of mandate compelling the City to give Branciforte a private open space credit. We do not reach the question whether a writ of mandate would lie to compel the City to enact an ordinance providing some credit for private open space consistent with section 66477, subdivision (e), since respondent Branciforte did not seek such relief.

The order directing issuance of a writ of mandate is reversed. Respondent shall bear costs on appeal.

Bamattre-Manoukian, J., and Duffy, J., concurred.